## Maxwell M. Fisher and others v. Bernard L. Meister and another.

*Assignee of mortgage: Bill in equity: Parties.* An assignee of a mortgage may sue upon it in equity, in his own name, where the assignors have intentionally vested him with full title and authority, and there is no conflict between them, whether the title is absolute or in trust.

*Note and mortgage: Consideration: Bona fide holder.* A note and mortgage given for a fixed sum, and payable absolutely, but with no consideration except an undertaking to furnish goods, which the mortgagees afterwards failed to furnish, cannot be enforced, where the holder is not a *bona fide* holder for value.

*Homestead: Conveyance: Signature of wife: Acknowledgment: Wife's separate property.* A homestead cannot be conveyed or mortgaged without the signature of the wife, as a party to the conveyance. And in all cases where a wife joins her husband, in a conveyance, her free, separate acknowledgment is necessary to make the deed valid. It is only her separate estate that she can deal with as if unmarried. The old law remains, as to all conveyances in which she must join with her husband.

FISHER *v.* MEISTER.

*Acknowledgment of wife: Husband's presence.* The husband's presence during the acknowledgment is unlawful, and the law presumes that such a deed, acknowledged in his presence, may be under a coercion which would not be apparent to third persons. The acknowledging officer is bound to ascertain to a certainty that the wife acts freely, before he can lawfully certify the acknowledgment, and a failure to do so is a violation of his official oath.

*Homestead mortgage: Wife's acknowledgment.* A homestead mortgage, made at the joint solicitation, and in the presence, of the husband and one of the mortgagees, and acknowledged in their presence, if at all,—when the wife could not understand English, and the acknowledging officer made a merely formal inquiry of her in that language, and could speak no other,—was held to be invalid.

*Notary's certificate of acknowledgment.* A notary has no right to certify any thing that he does not know of his own knowledge, by an intelligent interchange of conversation, and without relying on the aid or statements of others than the person whose acknowledgment he proposes to take. He must get what he certifies directly from the party, and be fully assured by her own statements of the freedom of her action.

*Heard April 5 and 6.    Decided April 10.*

Appeal in Chancery from Bay Circuit.

This bill was filed by Maxwell M. Fisher, David G. Preston and Elisha G. Booth against Bernard L. Meister and Rebecca Meister. The defendants answered separately, and proofs were taken. The decree was for complainants, and the defendants appealed.

*Green & Scofield,* for complainants.

*Marston & Hatch,* for defendants.

CAMPBELL, J.

Complainants filed their bill as assignees, to foreclose a mortgage upon the homestead of defendants for one thousand dollars, given to secure a negotiable note. The securities were assigned to complainants, who are bankers, absolutely, but they were to be held as collateral security against any overdrafts or similar liabilities, and no such liabilities have ever existed to their damage. As a matter of fact, we think there is no doubt, from the proofs, that the original mortgagees, Simon Ferner and Hyams Kraushaar, transferred the papers before maturity to be held for their convenience, and to cut off the defenses likely to be made

in case the debt was litigated. It is not claimed that the assignees are *bona fide* holders without notice, or that they are not bound by all equities attaching to the securities.

It is claimed by the defense, that the interest of complainants is not such as to authorize them to maintain this suit. But as they are assignees, by an absolute assignment, made with the full intention of the assignors that they should have all the powers of assignees, and this appears from the testimony of the assignors themselves, we see nothing to distinguish this from any other case where the party holding a legal title sues to collect the security. Where there appears to be no conflict between assignor and assignee as to the validity of the assignment, the latter may sue in equity as owner, though a mere trustee, to enforce the debt. *Morey v. Forsyth, Walk. Ch. R., 465.*

The defense rests on two grounds: *First,* The want or failure of consideration; and, *second,* the insufficiency of the proceedings to affect the homestead right which was mortgaged.

As both defenses rest somewhat on the same grounds of fact, it will be proper to refer to both in their order.

Defendants claim that the note and mortgage were given in consideration of goods to be furnished by Ferner & Kraushaar to Bernard L. Meister, which were not furnished as agreed. Complainants claim that the object of the note was to secure to Ferner & Kraushaar a larger amount than they were likely to get by way of dividend on an old debt, as creditors under a general assignment made by Meister, whereby his property was to be disposed of ratably among his creditors, and under which the dividends were not likely to pay the debts in full.

There is an amount of false testimony in this case exceeding any thing usually met with in the experience of courts, and it would be a waste of time to attempt to balance

statements directly in conflict. We must judge of the case by probabilities and circumstances going to corroborate the different stories, and in the light of these we have no doubt where the equities are to be found.

Bernard L. Meister having made an assignment without preferences, under which Ferner & Kraushaar had a debt due them of between five and six thousand dollars, was employed by the assignees to aid in making sales; and Ferner & Kraushaar had furnished him goods to sell on commission without security, the goods being sold in the same store, and serving to keep up an assortment, and so help the sale of the assigned goods. He had faithfully accounted for these goods. In the beginning of May, 1866, the note and mortgage were given in pursuance of an arrangement begun in Detroit, and finished in Bay City. Ferner & Kraushaar profess that the security was given them because of former favors shown Meister, as a payment outside of the assignment upon their old debt, and obtained upon occasion of their having to raise money to pay off a liability arising out of their old dealings, which had cramped them. Meister says that they agreed, if he would give them a mortgage on his homestead, to sell him goods on credit to the amount of the mortgage, which was first talked of as a transaction of six hundred dollars, but afterwards fixed at one thousand dollars, at Bay City,—the increased credit being given to induce his wife to consent to making the mortgage.

The probabilities are all in Meister's favor. By sacrificing his homestead to put one set of creditors on a preferred footing, after he had failed to do so on his assignment, he would gain nothing for himself, and would effectually debar himself from any means of getting back into business, by cutting off his last capital. His wife, who was not required to consent to such a transaction, would not

be likely to do so for a purpose that could not fail to injure both; and the testimony shows that she was not in fact inclined to make any such sacrifice. Her testimony seems reasonable on this point.

The evidence shows that he had, since the assignment, and without any security given or required, sold a considerable amount of goods on commission for Ferner & Kraushaar, and had just closed up his commission account in full.

It shows that while in Bay City, and during the negotiations connected with the mortgage, and just before or after it was executed, Ferner and Meister made out a bill of goods, which was copied by a clerk of the assignees, Mr. Hyde, which, if that witness is correct in his recollection, conformed to Meister's claim, that he was to have goods forwarded to the amount of the mortgage. We take occasion to say that Mr. Hyde's testimony is fair and candid throughout, and contrasts very favorably with that of some very unscrupulous witnesses, who seem to have had no regard whatever to truth or probability. Whatever he says in the case, we have no doubt he says truly. And while it is quite likely that Meister would be willing to strain his resources to get back into business again on his own account, it does not appear likely that any reasonable man would put it out of his power to do so, out of any idea that it was his duty to make any greater provision for one creditor than for another, at the expense of his family, and to the destruction of his means of living. And from what appears in this record in regard to the sentiments and relations of the parties, no such excess of gratitude could have been reasonably expected from their previous dealings.

It is also clear that Ferner and Kraushaar, on any theory of the case, deceived Meister. They were in no pecuniary straits. They stood well with their bankers before

and after the mortgage. They made no attempt to raise money on it, and did not deposit it until October, and then it was evidently for a dishonest purpose. But we find that within a day or two after the mortgage was given they advised Meister that their lawyer thought it would be unsafe just then for him to have any new goods in his store till his debts were settled, and gave this as a reason for not sending them. This indicates that goods were expected, for not sending which some excuse was required. As they had for several months been sending goods on commission, it is not likely they had any new light on the dangers of that; and the most probable solution of the question is that Meister's story is the true one, and the goods kept back were his. As Ferner and Kraushaar deny everything material, their statements throw no light on the point.

Without sifting out the whole evidence, which no ingenuity can harmonize, we are satisfied that the securities were given for goods to be furnished on some terms, either on commission or absolutely; and that no such goods were furnished. This being so, the mortgage and note cannot be collected. They cannot be enforced for any thing more than has been paid for them, and that is nothing at all.

This might dispose of the case, were it not for the propriety of passing upon the questions presented under the homestead law.

Under our constitution and statutes a homestead cannot be conveyed or encumbered without *the signature of the wife to the conveyance or mortgage.* This plainly requires her to be a party to the conveyance.—*Comp. L., pp. 73, 1218.* Our statute in regard to conveyances declares that "when any married woman residing in this state shall join with her husband in a deed of conveyance of real estate situated within this state, the acknowledgment of the wife shall be taken separately and apart from her husband; and she shall

acknowlege that she executed such deed freely and without any fear or compulsion from any one."—*Comp. L.* § *2731.*

This language is too clear to need construction. The free separate acknowledgment is necessary to the validity of the instrument. It is only in regard to her separate estate that a wife may now act as if unmarried. In regard to other property the law is unchanged.

As Ferner was present when the paper was executed and acknowledged, and had actual knowledge of what occurred, it is not necessary to consider what the presumptions might have been under other circumstances. And the facts which occurred were peculiar, in view of the requirements of the statutes.

Mrs. Meister did not understand English, and none of the English witnesses present understood German or Hebrew. Ferner and Meister both testify concerning the conversation with her in regard to executing the papers. We leave out of view Maxwell's reading, which could have conveyed to her no idea whatever concerning the mortgage or the business.

We think it manifest from the various events which took place at Bay City, that Mrs. Meister was very unwilling to execute the mortgage, and that, up to the time of signing, that reluctance continued. Her own testimony is very positive, that she signed it to avoid family difficulty; and there is much to corroborate it. The statute requiring an acknowledgment to be taken apart from the husband, goes on the ground that if there is any disposition to exercise influence, his presence may be, of itself, sufficient to produce a moral coercion which may not be apparent to third persons. It is this principle which, in criminal law, excuses the crimes of a wife committed in her husband's presence, unless shown to have been committed without his influence or instigation. And it is therefore quite import-

ant in all cases, in disposing of an interest so carefully guarded against the husband's control that even the legislature cannot take away the protection, to be sure that the apparent act of the wife is not really the act of the husband, and to exclude him from the conference, which it is supposed will enable the acknowledging officer to find out to a certainty that the wife is acting freely. Constitutional safeguards cannot be trifled with by an acknowledging officer without a serious violation of law, and a breach of his oath of office.

In this case the only explanation which Mrs. Meister got of this mortgage and its purposes came from her husband and Ferner,—both interested to get it from her; and, if she is to be believed, not succeeding in doing so without, at least, very great pressure. She neither read it nor heard it read, except in what was to her as much a dead language as Hebrew was to the draughtsman and the notary. It is quite probable, however, that she did comprehend its nature, and what was meant by affixing her mark, by touching the pen as it was made. The notary proceeded to take the acknowledgment. Her husband was present in contemplation of law, and was in fact near enough to have the full influence of his presence felt. Ferner, Meister, Maxwell and the notary were all in the same room, and she was just beyond the door in the next room, in sight of them all. Whether it might be possible for a notary to hold such a colloquy, under those circumstances, as would be of any use in finding out whether the wife acted freely or not, it is highly improbable; and such an examination cannot be properly called a separate one.

But in the present case there was no separate examination, and no examination at all. In *Dewey v. Campau, 4 Mich. R., 565,* it was held that a notary could not take an acknowledgment by hearsay, even through a sworn inter-

preter, where there was no law for swearing him. But here the officer asked the simple question in English, whether Mrs. Meister executed the mortgage freely and without fear or compulsion. No one interpreted between them, and she probably did not understand a word of the question. If she answered him in the German word signifying "yes," she must have answered at random. There was not even contemporaneous hearsay as to her comprehension and wishes. He says Mr. Meister told him afterwards that she understood it. But this is not only hearsay *ex post facto*, but hearsay from a person who, upon this particular question, would not lawfully have been allowed to learn the fact himself except by hearsay,—as his presence was forbidden.

This whole proceeding was a direct violation of law. A notary has no right to certify except what he knows of his own knowledge, and by intelligent interchange of conversation, concerning which there can be no room for mistake. He has had his duties prescribed for the express purpose of preserving married women from being inveigled or coerced into an unwilling disposal of their rights. He is bound to satisfy himself that the act which he certifies, is free and unconstrained, and he is bound to get his knowledge from the woman herself. Without scrupulous care on this subject, the statutes and the constitution are practically nullified.

As the whole proceeding took place in Ferner's presence, and he could not pretend to any ignorance of the facts, there is nothing to relieve the complainants from any of the consequences of asserting what was a nullity as against both defendants.

The decree must be reversed, and the bill dismissed with costs of both courts.

The other Justices concurred.