[No. 2412]

# THE STATE OF NEVADA, Ex Rel. W. D. MOODY, PETITIONER, *v.* W. H. WILLIAMS, J. D. AUSTIN, AND L. L. ALLEN, AS MEMBERS OF THE BOARD OF COUNTY COMMISSIONERS OF CHURCHILL COUNTY, NEVADA, RESPONDENTS.

[185 Pac. 459]

1. PROHIBITION—QUESTIONS OF PUBLIC IMPORT REVIEWABLE ON MERITS.
    On application for prohibition, the supreme court may consider the questions involved on their merits, where the public is vitally concerned and long and expensive litigation will thereby be avoided.

2. STATUTES—CONSTRUED IN LIGHT OF FACTS.
    A legislative enactment must be construed in the light of known facts suggested by the act itself.

3. TAXATION—TAX MUST BE FOR PUBLIC PURPOSE.
    There can be no lawful tax which is not laid for a public purpose.

4. COUNTIES—BONDS TO BE PAID BY TAXATION ILLEGAL UNLESS FOR PUBLIC PURPOSE.
    Where county and municipal bonds are issued whose payment is provided for solely by taxation, their validity depends upon the question whether the purposes to which the proceeds of the bonds are to be applied are public purposes.

5. COUNTIES—BONDS TO RAISE MONEY TO LOAN TO LAND OWNERS ILLEGAL.
    Stats. 1919, c. 204, authorizing the county of Churchill to issue bonds to establish a fund to loan to private land owners for the purpose of reclaiming arid lands, is invalid, in that the method provided is ineffective and would result in taxation for private purposes.

6. TAXATION—RESTRICTIONS ON POWER OF STATE TO TAX.
    The only restriction on the power of the state to tax property within its jurisdiction and to direct the purposes for which taxes shall be raised is that the assessment shall be uniform and equal and the purpose a public one.

7. STATUTES—LEGISLATIVE AND JUDICIAL POWERS.
    So long as the legislature acts within the powers given it, the courts cannot interfere.

8. TAXATION—TAX FOR PUBLIC IMPROVEMENT MUST BE EFFECTIVE.
    A tax for a public improvement to be legal must be effective, and a tax designed to accomplish a vast reclamation project must rest upon some safer hypothesis than the volition and individual energy of those upon whom is the duty to make the law authorizing the tax effective.

9. STATUTES—SCOPE OF POWERS.
> The courts cannot hold a statute valid because it is sanctioned by the legislature and public opinion, where the statute is not within scope of legitimate legislation.

PROCEEDING in prohibition by the State of Nevada, on the relation of W. D. Moody, against W. H. Williams, J. D. Austin, and L. L. Allen, as members of the Board of County Commissioners of Churchill County, Nevada. **Writ ordered to issue.** COLEMAN, C. J., dissenting.

*G. J. Kenny,* District Attorney, for Petitioner.

*Leonard B. Fowler,* Attorney-General; *Robert Richards,* Deputy Attorney-General, and *A. L. Haight,* for Respondents.

By the Court, SANDERS, J.:

The board of county commissioners of Churchill County, at its meeting in May, 1919, unanimously adopted this resolution:

"*Resolved,* That it is the intention of this board, under the authority of an Act of the Legislature of the State of Nevada, approved March 29, 1919, being chapter 204 of the Laws of Nevada, Twenty-Ninth Session, to proceed with the issuance of the bonds of this county, to the amount of $240,000, and to apply the moneys derived from the sale thereof towards the purposes specified in said Act."

1. An impression widely prevails that the legislature exceeded its authority in authorizing the board of county commissioners to issue the bonds provided for in the act (Stats. 1919, c. 204), and that the bonds would, if issued, be destitute of legal obligation. An early decision of the questions involved is important, because, if the act be legitimate legislation, the county may avail itself of its benefits and negotiate more easily and at higher figures the securities, and that, on the other hand, should the legislation be not legitimate, no steps may be taken under it, the evil of repudiation avoided,

as well as long-drawn-out and expensive litigation. We deem these considerations sufficient to justify us in considering the question on its merits, without regard to the method adopted (prohibition) to have the law reviewed. State v. Osawkee Township, 14 Kan. 418, 19 Am. Rep. 99.

The board of county commissioners of Churchill County is authorized, under the provisions of the act, to prepare and issue bonds of said county, bearing interest at the rate of 3 per cent per annum from date, in the sum of $240,000. For a clear understanding of the nature of the bonds and the legal questions involved, it is necessary to give a summary of the provisions of the act. The sections that embody its principal features, in so far as they relate to the bonds, are sections 6 and 7:

"SEC. 6. The board of county commissioners of said county is hereby authorized to use the moneys derived from the sale of said bonds, or such portion thereof as they may deem advisable, in assisting bona-fide owners and entrymen of agricultural lands in said county in the leveling of such lands and in placing the same under cultivation, under such regulations as said board may adopt in conformity with the spirit of this act. Such assistance shall be in the nature of loans made to such owners and entrymen from said 'Reclamation Fund,' and the said board is hereby authorized and required in every case where such loan is made to secure the repayment thereof by a first lien for the amount of such loan upon the land embraced within the farm unit or legal subdivision in which the land so to be leveled and placed under cultivation, as specified in the application for such loan, is situated. * * *

"SEC. 7. No loan shall be made from said 'Reclamation Fund' except for the purpose of placing under cultivation lands not leveled at the time of making application for such loan, nor shall any loan be made in an amount exceeding the cost of leveling such lands, and the amount which may be loaned for leveling any one acre shall not exceed fifty dollars; provided, that upon the unanimous vote of the members of the board of

county commissioners, in the case of lands unusually difficult to level and which, when leveled and placed under cultivation, will in the judgment of the board be of exceptional value, such loans may be made in an amount not to exceed seventy-five dollars per acre. No money shall be advanced upon any application for a loan hereunder until the land specified therein shall have been leveled and seeded nor until it shall have been demonstrated to the satisfaction of the board that it can be properly irrigated and that all work in connection with the land has been performed in conformity with the general scheme of reclamation, irrigation and drainage obtaining in the district in which such land is situated."

It is provided by section 8 that the money so loaned must be paid in annual installments, commencing at a time to be fixed by the board, but not later than July 1, 1923, and the whole amount thereof shall mature and be paid as the board may direct, but in any event prior to July 1, 1938.

The board is authorized by section 11 to charge and collect on said loans a rate of interest not in excess of 5 per cent per annum. The applicant for a loan is required to pay an application fee of not to exceed 2 per cent of the amount of the loan for which application is made.

By section 16 it is provided: The board of county commissioners shall annually levy and assess on all the taxable property of said county, including the net proceeds of mines, a special ad valorem tax for such amount as shall be necessary or sufficient to pay the interest semiannually as it shall accrue and also to pay the principal of such bonds as they severally become due, until all of said bonds with the interest shall have been fully paid.

2. To deal fairly with this legislation, it must be construed in the light of known facts suggested to us by the act itself. Whether the statements that follow are perfectly accurate or not is a matter of no great importance.

The United States reclamation project referred to in

the act, known as the "Newlands Project," embraces within its scope the major portion of the area of lands within Churchill County. Approximately between 70,000 and 80,000 acres of land in said county are now under contract with the government to be irrigated from this source. It is fair to assume that such lands are covered with hills, mounds, gullies, and brush which render their irrigation and immediate production difficult—perhaps impossible—without a large expenditure of money. From the provisions of the act it is fair to assume that the owners and entrymen of these lands are not financially able to bring the same in their present condition up to their full measure of production, and if left to the individual efforts of their owners, without assistance, it would take time, possibly years of patient toil under adverse conditions and contingencies. It is evident that the legislative body considered the leveling and the placing of these lands under cultivation to be the proper subject of a public undertaking, and to accomplish this it has inaugurated a loaning enterprise. The loans authorized for the purposes stated are to be secured by a first lien upon the lands to be leveled, and also by special assessments to be annually levied and assessed sufficient to cover the annual installments of all outstanding loans as they become due and until fully paid. The conditions of the loans are that none shall be made except upon lands not leveled at the time of making application for such loans; and no money shall be advanced upon any application for a loan until the land specified therein shall have been leveled and seeded, nor until it shall have been demonstrated to the satisfaction of the board that the land is irrigable and that the applicant has done all the work in connection therewith in conformity with the general scheme of rereclamation obtaining in the district where the land is situated.

3, 4. If the legislation in question can be sustained at all, it must be so sustained under the general power of the state to direct and determine the objects to be provided for, fostered, or aided through the expenditure of

public moneys. The exercise of such power necessarily involves a tax. It is in the power to direct the objects of taxation that the state finds its authority to organize irrigation, drainage, and assessment districts and to foster other public improvements equally as beneficial to the public. In order to speed up the cultivation of the lands specified in the act, it was the intention of the legislature to establish a tax or assessment district out of the entire county of Churchill. It is only in this view that the law can be vindicated, as it is fundamental that there can be no lawful tax which is not laid for a public purpose, and that, where county or municipal bonds are issued whose payment is provided for solely by taxation (as here), their validity depends upon the question whether the purposes to which the proceeds of said bonds are to be applied are public purposes. Gibson v. Mason, 5 Nev. 283; Gold Hill v. Caledonia S. & M. Co., 5 Sawy. 583, Fed. Cas. No. 5512, (9th Cir.); State v. Osawkee Township, supra; People v. Salem, 24 Mich. 452, 4 Am. Rep. 400; Citizens S. & L. Assn. v. Topeka, 20 Wall. 655, 22 L. Ed. 455.

5. As the proposed bonds involve the power of taxation, their validity must depend upon the legality of the tax. In so far as the result of the tax is to reclaim a large area of the agricultural lands of Churchill County, it may be said to be a tax for a public purpose. To this extent the legislation is legitimate, but the question to be determined is whether the plan adopted by the act for executing its purpose is equally legitimate. The plan adopted for the reclamation of the lands is to raise a fund by the sale of county bonds, the proceeds of which are to be applied in assisting owners and entrymen by way of loans from said fund to the amount of fifty to seventy-five dollars per acre for defraying the preliminary expense of leveling their lands and placing the same under cultivation. Our general objection to the tax is that it is a deviation from the usual and long course of usage of the taxing power. Our specific objection to the tax is that the board of county commissioners of

Churchill County is authorized to use the moneys derived from the sale of the bonds for private purposes. Under the plan adopted, a dozen or as many hundreds of acres of land may be placed under cultivation and the remainder left to go unreclaimed. One owner may be moved to take advantage of the proffered assistance, and others would not be so inclined. One owner or entryman might undertake, through the plan adopted, to reclaim all of his land, while others would be disposed to reclaim but a fraction of their holdings, or look to other sources for assistance than the public fund. It is clear that the operation of the law might result in the taxing of a citizen for the use of a private enterprise conducted by other citizens. Such result is an unauthorized invasion of a private right and contrary to the fundamental principle that no tax is a valid tax except it be laid for a public purpose.

6, 7. We concede that the only restriction on the power of this state to tax property within its jurisdiction and to direct the purposes for which taxes shall be raised is that the assessment shall be uniform and equal and the purpose a public one. So long as the legislature acts within these conceded powers, the courts may not interfere. Gibson v. Mason, supra; Gold Hill v. Caledonia S. & M. Co., supra.

8. We have above intimated that the primary scope and purpose of the act is legitimate legislation, in that it has for its object the reclamation of a vast area of irrigable agricultural lands in the county of Churchill. Our objection to the law is not directed to its object or its expediency. These are matters for the legislature and not for courts. Taxation is eminently practical, and for the purpose of deciding its validity a tax should be regarded in its actual practical results, rather than the reference to the beneficent purpose for which the tax is authorized. It is but just to assume that the legislature in adopting the loan plan was inspired with the belief or expectation that its operation would result in the reclamation of all the lands specified in the act. So far

so good, but when we come to analyze its provisions we find nothing in its terms or conditions that furnishes any assurance to the taxpayers of Churchill County that the plan adopted will accomplish the desired result. Under the plan adopted, it is reasonably probable and positively possible that the proceeds of the bonds will not be utilized for the purpose stated in the act. Before a citizen can be coerced to donate to a fund under the guise of a tax for a public improvement, it must be certain that the tax will result in its accomplishment. The obnoxious feature of the loaning enterprise that furnishes the consideration and inducement of the whole act is that it is ineffective and unenforceable. The whole scheme of the law seems to be based on the assumption that the loan fund, when once established from the sale of the bonds, will serve as an incentive or stimulus to the land owners or entrymen to bring all their holdings under cultivation in accordance with the terms and conditions of the act. We see in the law no rational ground for such assumption. It is not pretended that these farmers can be coerced to level and place their lands under cultivation, or that they will be impelled to patronize the loaning enterprise established directly for their benefit and indirectly for that of the public. Still, by the express terms of the act the taxpayers of said county are coerced to satisfy $240,000 worth of bonds by means of taxation without any assurance in advance that the purpose or the result of the tax will be accomplished. A tax for a public improvement to be legal must be effective. A tax designed to accomplish so vast an undertaking as the reclaiming of thousands of acres of lands to be legal must rest upon some safer hypothesis than the volition and individual energy of those upon whom it is the duty to make the law effective.

Entertaining these views, we conclude that the plan adopted for the execution of the law will not accomplish its purpose, and that the bonds in question, if issued, would be destitute of legal obligation.

9. A strong appeal is made to us to approve the loan

experiment to bring the lands specified in the act under cultivation because it is sanctioned by the legislature and public opinion, but these considerations do not supply the legal element necessary to bring the scheme to execute the law within the scope of legitimate legislation. "Ours is an unmixed duty, to declare the law as it is, and not as we might wish it to be."

Let the writ issue as prayed for.

COLEMAN, C. J.:  I dissent.