# A. E. CAUBLE ET AL., PETITIONERS, *v.* ELWOOD H. BEEMER, RESPONDENT.

No. 3475

February 17, 1947.                    177 P. 2d 677.

78

*Springmeyer & Thompson*, of Reno, for Petitioners.

*Harold O. Taber, Grant L. Bowen, Gordon R. Thompson*, and *John C. Bartlett*, all of Reno, for Respondent.

## OPINION

By the Court, Horsey, J.:

This is a proceeding in mandamus. The petitioners are A. E. Cauble, Leo Corvino, Curtis Farr, A. E. Landers and O. C. Moulton, as and constituting the board of trustees of Washoe general hospital.

In brief, the petitioners, in their petition that a writ of mandamus issue, among other things, allege, in substance:

That by a legislative act approved March 27, 1945, St. 1945, c. 243, the board of county commissioners of Washoe County, Nevada, were authorized to issue the bonds of said Washoe County, not to exceed $750,000, for the construction and reconstruction of said hospital;

That on November 4, 1946, petitioners duly requested said county commissioners to direct respondent, Elwood H. Beemer, as the county clerk and ex officio clerk of the said county commissioners of Washoe County, to issue such bonds, in the form and manner provided by the said statute of March 27, 1945;

That on November 20, 1946, pursuant to said request, the said board of county commissioners of said county, by an appropriate resolution, duly directed the said

clerk, the respondent herein, to issue said bonds, in the form and manner provided by the said statute of March 27, 1945;

That on November 21, 1946, the petitioners made written demand upon the respondent, that he issue said bonds in accordance with such resolution and said statute;

That on November 22, 1946, the respondent refused, in writing, and still refuses, to issue said bonds, for the reason that he doubts the constitutionality of the said statute of March 27, 1945.

In paragraph 8 of said petition, the petitioners further allege that:

"The public health, safety and general welfare require the issuance of the Writ herein for the reason that an emergency exists in that the physical facilities of the Washoe General Hospital are insufficient and inadequate in the following particulars:

"a. Said hospital because of a large increase in community and transient population is not large enough to accommodate people entitled to hospitalization therein;

"b. Said hospital was constructed many years ago; it is poorly ventilated, its lavatories are overtaxed, and there are general unsanitary conditions.

"c. Because of lack of space, indigent and semi-indigent patients are housed together; the building is without proper isolation wards to segregate patients suffering from contagious or infectious diseases.

"d. The heating plant and the boilers are outmoded and are incapable of properly heating the premises.

"e. The construction of the building is such that a serious fire hazard exists.

"f. Several Washoe County grand jury reports have directed attention to the inadequate, dangerous and unsanitary conditions existing at the hospital. The Washoe County Planning Commission, by resolution in form and manner provided by law, has approved plans for the reconstruction of the hospital."

The petitioners prayed for the issuance of an alternative writ of mandate, and this court, on December 17, 1946, duly issued such an alternative writ, requiring the respondent either to issue said bonds or to appear and show cause, on January 17, 1947, why he had not done so. The respondent failed to issue said bonds, but on December 19, 1946, filed an answer and return, in which he admitted the facts alleged in the above-quoted paragraph 8 of said petition, as well as paragraphs numbered 1, 2, 3, 4, 5, 6, and 7 thereof, and denied the allegations of paragraph 9, in which the petitioners allege they "have no plain, speedy and adequate remedy in the ordinary course of law.

The respondent, in his answer and return, alleges four grounds upon the basis of which he claims the said statute of March 27, 1945, to be unconstitutional. These grounds will be hereinafter stated.

The respondent, in his brief, has presented an additional ground upon the basis of which he claims the said statute of March 27, 1945, is unconstitutional, said additional ground being that the said statute, "is a local and special law regulating county business."

The hearing upon the petition and the answer and return was set for, and held on, January 22, 1947, the matter was argued by the respective attorneys, and thereupon duly submitted.

We will now consider, and pass upon, each of the questions presented by the respondent, upon the basis of which he claims the said act of 1945 to be unconstitutional, but shall not follow, precisely, the order in which respondent has presented them.

The respondent claims, in effect, that the tax levy to redeem the proposed hospital bonds provided, by said act of March 27, 1945, to be made by the county commissioners of Washoe County, is a tax for a private, and not a public, purpose.

The respondent, as the basis of his contention that the purpose of the proposed bond issue is private, has cited,

and relied upon, a portion of sec. 8 of art. I of the constitution of the State of Nevada, said portion being as follows: "* * * No person shall * * * be deprived of life, liberty, or property, without due process of law."

■ This constitutional provision would be applicable to defeat the constitutionality of said act, if its purpose were private, rather than public. State v. Board of Com'rs of Churchill County, 43 Nev.290, at page 295, 185 P. 459 (cited by respondent).

The respondent has cited, in support of his contention that the hospital is private, sec. 2233, vol. 1, N.C.L.1929, which is as follows: "Every hospital established under this act shall be for the benefit of the inhabitants of such county or counties, and of any person falling sick or being injured or maimed within its limits, but the board of hospital trustees may extend the privileges and use of such hospital to persons residing outside of such county or counties upon such terms and conditions as said board may from time to time by its rules and regulations prescribe. Every such inhabitant or person who is not a pauper shall pay to the said board, or such officer as it shall designate, a reasonable compensation for occupancy, nursing, care, medicine, and attendance, other than medical or surgical attendance, according to the rules and regulations prescribed by said board; such hospital always being subject to such reasonable rules and regulations of said board may adopt in order to render the use of said hospital of the greatest benefit to the greatest number; and the said board may exclude from the use of such hospital any and all inhabitants, and persons, who shall wilfully violate such rules and regulations."

Said section 2233, vol. 1, N.C.L.1929, is, also, section 9 of the certain act approved March 27, 1929, and which is entitled: "An Act to enable counties to establish and maintain public hospitals, levy a tax and issue bonds therefor, elect hospital trustees, maintain a training school for nurses, and provide suitable means for the

care of such hospitals and of disabled persons, and repealing a certain act."

From the title of the act, it is apparent that the legislature intended, by the act, to confer authority upon, and to enable, counties to establish and maintain public hospitals only, and said section 9 expressly refers, and applies only, to "every hospital established under this act," that is to say, when considered in conjunction with the title of the act, every "public" hospital. So it is clear that the legislature, in stating, in said section 9, sec. 2233, vol. 1, N.C.L.1929, the purpose of the hospital, intended to state what the members of the legislature considered to be the appropriate purposes of a public, rather than a private, institution of that nature.

Respondent contends, in his brief, on pages 4 and 5, as follows: "In the light of the above quoted statute, it is readily apparent that the fundamental difference between the Washoe General Hospital and any so-called 'private' hospital is the free service afforded by the former to paupers. To uphold the Act in question, this Court must determine that that difference alone, places the tax for the benefit of Washoe General Hospital well within the public purpose doctrine. Respondent contends this difference to be insignificant."

The broad scope of the first sentence of said section 9, providing, in effect, that "every hospital established under the act shall be for the benefit of the inhabitants (meaning all of the inhabitants) of such county ` * * * and of any person falling sick or being injured or maimed within its limits," far transcends the usual scope of the purposes and duties of a private hospital, not only, because it is made the duty of the county hospital to receive, and extend its facilities to, all the inhabitants of the county, as they may have need for them, and to any person falling sick or being injured or maimed within its limits, regardless of the financial ability to pay, of such inhabitants, or of such persons so falling sick or being injured or maimed within the county

limits, but, also, because such inhabitants and such persons are absolutely, and without restrictive limitations, required to be received and extended the benefits of the hospital. For instance, the county hospital, under the broad scope of said provision, cannot deny a patient admittance or care because the facilities are over-crowded, or for the reason that they may not be equipped or prepared to treat the particular disease with which he is suffering, or that such disease is contagious, or, from the standpoint of the capacity, policy or convenience of the hospital or its personnel, the particular patient is undesirable. This sort of restrictions is commonly applied and permitted in the case of a private hospital, by reason of the limited scope of its purposes and the fact that the nature of its relationship to the public is entirely contractual.

■ We cannot agree, therefore, with respondent's theory that the only fundamental difference between the Washoe general hospital and a private hospital is the free service afforded by the former to paupers. The difference above outlined, of freedom from discriminatory restrictions on admission, is also a vital and fundamental difference, far reaching in its scope and in its general beneficence. Neither can we agree that the difference involved in the free service by the county hospital to paupers is insignificant. It is a usual function of county or similar local governments, recognized in all civilized countries, and applied to the extent that their circumstances permit. In the United States, it is of almost universal application, as it is in practically all countries conscious of their humanitarian duties and responsibilities. The benefits that flow from such provisions to those so unfortunate as to be, not only physically ill, but, also poverty stricken, are not insignificant. They are of immeasurable value, and often mean the difference between restoration to health and confirmed invalidism, and, not infrequently, the difference between life and death. Contributions made by local government

for the proper treatment of its indigent sick and afflicted, pay large dividends, in the enhancement of the public health, welfare and happiness, and contribute materially to the stability and permanence of democratic government.

The provisions of section 9 of the said act approved March 27, 1929, sec. 2233, vol. 1, N.C.L.1929, are ample in their definition and statement of purpose to constitute a sufficient basis in law for the characterization of a county hospital, established or maintained under said act, as a public hospital. Certainly, the fact that the purposes as stated in said section are sufficiently broad to permit the extension of the privileges and use of such hospital to persons residing outside of such county, upon such terms and conditions as said board may from time to time by its rules and regulations prescribe, either because of reciprocity or solely in a spirit of comity, or for other reasons which the legislature deemed sufficient, does not, in any degree, lessen its public character, but rather broadens the same. There has been no showing that the purposes of the Washoe General Hospital do not conform to the purposes stated in said section 9. We feel constrained to hold, therefore, that the proposed bond issue authorized by the county commissioners of Washoe County, by their resolution passed November 20, 1946, is for a public and not a private purpose, and that same in no manner deprives, or will operate to deprive, the taxpayers, or any taxpayer, of Washoe County of property without due process of law.

■ The respondent sets up, in his answer and return, the contention that the statute of March 27, 1945, is unconstitutional in that it violates sec. 17 of art. IV, (respondent has inadvertently referred to art. 3, but evidently means art. IV), of the constitution of the State of Nevada, by embracing in the title more than one subject and matters properly connected therewith. This alleged ground of unconstitutionality is not urged or argued in respondent's brief. We are satisfied that the

title of the act embraces only one subject and matters properly connected therewith, and that, therefore, such title complies sufficiently with said sec. 17 of art. IV of the constitution of the State of Nevada, and is not violative of said section, or any requirement thereof.

In his answer and return, the respondent sets up, by way of affirmative defense, the contention that the statute of March 27, 1945, is unconstitutional in that it violates sec. 20 of art. 3 (meaning, doubtless, art. IV) of the constitution of the State of Nevada, by establishing a local and special law for the assessment and collection of taxes for county purposes. In his brief, respondent does not discuss this alleged ground, but does contend that the said act of March 27, 1945, is unconstitutional because violative of said sec. 20 or art. IV, in that same is "a local and special law regulating county business." The respondent contends further, in his brief, that said act of March 27, 1945, is unconstitutional in that same is a local and special law, not providing for the submission to the vote of the electors of Washoe County, of a proposal for the bond issue in question, whereas a general law, to-wit, an act entitled, "An Act relating to bond elections, providing for the manner of holding the same, defining the duties of certain persons in relation thereto, and other matters properly relating thereto," approved March 20, 1933, same being chap. 95, Stats.1933, pp. 116, 117, and providing for, and requiring, the submission to the vote of the electors of the municipality (including counties) proposing to issue bonds, a proposal for such bond issue, is applicable, within the meaning of sec. 21 of art. IV of the constitution of the State of Nevada.

Sec. 20 of art. IV of the Nevada Constitution is as follows: "The Legislature shall not pass local or special laws in any of the following enumerated cases—that is to say: * * * regulating county and township business; * * * for the assessment and collection of taxes for State, county and township purposes; * * *."

Sec. 21 of said art. IV reads: "In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the State."

■ As this court stated in Washoe County Water Conservation District v. Beemer, 56 Nev. 104, on page 116, 45 P.2d 779, on page 782 (referred to and quoted by respondent in his brief, on p. 5): "It is a general rule, under such provisions as those of sections 20 and 21 of article 4 of the State constitution, that if a statute be either a special or local law, or both, and comes within any one or more of the cases enumerated in section 20, such statute is unconstitutional; if the statute be special or local, or both, but does not come within any of the cases enumerated in section 20, then its constitutionality depends upon whether a general law can be made applicable."

This same contention presented by respondent in his answer and return, but not contended for in his brief, namely, that the act in question (the statute of March 27, 1945) was a law for the assessment and collection of taxes, was contended for in Washoe County Water Conservation District v. Beemer, supra. In that case, the act assailed was a statute approved February 28, 1935, "authorizing" (as stated in the opinion in that case, on pages 110, 111 of 56 Nev., on page 780 of 45 P.2d) "the board of county commissioners of Washoe county to aid in the acquisition and construction of such reservoirs, waterworks, and improvements by issuing noninterest-bearing bonds of said county, delivering such bonds to petitioner, and levying and collecting taxes for the payment thereof. Statutes of Nevada 1935, p. 22." The said act of 1935 provided for the levy and collection of a special tax for the particular project authorized by said act, but not as to the mode or manner of the assessment, or of the collection of the tax. There was no substitution of a different method of either assessment or collection than provided by the revenue laws of general

application throughout the state. This court, therefore, in the opinion by Justice TABER, on page 117 of 56 Nev., on page 782 of 45 P.2d, stated: "It seems clear that the act in question is not a law for the assessment and collection of taxes, as those words are used in said section 20."

■ At that point, the case of Gibson v. Mason, 5 Nev. 283, 284, at pages 304, 305, was cited. In the latter case, the court, on pages 304 and 305, of 5 Nev., makes clear the distinction between a special or local law attempting to change or regulate acts which assessors and collectors of taxes generally perform, and which have been denominated "assessment" and "collection of taxes," and a special or local law authorizing merely the levy of a special tax. The court, in the opinion by Mr. Justice LEWIS, stated:

"It clearly could not have been intended by the framers of the Constitution to require a general law for the levy of a tax for a special purpose in a county. As in a case of this kind, when no county but that of Ormsby is required to levy a tax, and this for a special purpose, and the amount to be levied is necessarily fixed—how could a general law be enacted to meet the necessities of the case, without requiring all the counties of the State to levy a like tax? It could not, with the construction which counsel for respondent place upon this section.

"We are clearly of opinion that the constitutional provision simply prohibits special legislation regulating those acts which the assessors and collectors of taxes generally perform, and which are denominated 'assessment' and 'collection of taxes'; and that it does not inhibit the Legislature from authorizing or directing the County Commissioners from levying a special tax by the passage of a local law."

It could readily be seen that a special law attempting to change or infringe upon a general system of tax assessment or collection, uniform, and which should continue uniform, throughout the state, for reasons clearly

apparent, would be most unwise, and that same would create much confusion, and inefficiency in its operation and administration.

■ But neither the special act involved in Gibson v. Mason, supra, nor the special act involved in Washoe County Water Conservation District v. Beemer, supra, was applicable except as to the single levy for a particular project. They were limited in duration to the completion of the single project and the redemption of the particular bond issue involved, and in no sense related to, or operated to interfere with, the general plan or methods of tax assessment and collection. So it is in the instant case. We find, and hold, as this court held in Washoe County Water Conservation District v. Beemer, supra, that it is clear that the special or local act in question is not a law for the assessment and collection of taxes, as those words are used in sec. 20, art. IV of the constitution of the State of Nevada.

■ Is the said statute of March 27, 1945, a local or special law, or both, regulating county business?" That it is a local or special law, or both, there can be no doubt, as it relates entirely to a Washoe County project, and the tax levy to pay the bonds is confined to Washoe County taxpayers.

This court dealt with this question, also, under the very similar situation existing in said case of Washoe County Water Conservation District v. Beemer, supra. In that case, on page 117 of 56 Nev., on page 782 of 45 P.2d, it is stated: "It will be observed that the constitutional provision (section 20, art. 4) reads, 'regulating' county business, not 'relating to,' 'pertaining to,' or 'concerning' county business. To regulate is (a) to govern or direct according to rule (Webster); (b) to adjust, order, or govern by rule, method, or established mode (Funk & Wagnall); (c) to control, govern, or direct by rule or regulations (Oxford). These are not the only definitions of this word in the dictionaries cited, but they predominate there, as elsewhere, and conform to the

etymology of the word. The Act of February 28, 1935, does not undertake or attempt to lay down a rule to the effect that in Washoe county proposed bond issues need not, after the passage of the act, be submitted to the electors. It does not seek to amend, revise, or repeal the act of 1933 hereinbefore mentioned. It is rather an act intended to meet a particular and peculiar situation, in the nature of, or analogous to, an emergency.  *  *  *"

The same may be said in regard to the act in question in the instant case, the statute of March 27, 1945. In the latter, there is no attempt to formulate or apply any rule or regulation. The provisions of the act relate entirely to the particular bond issue for the single hospital construction and reconstruction project. They provide for the issuance of bonds, and their execution, negotiations for their sale, for the tax levy, and the bond redemptions.

It is manifest the framers of the constitutional provision prohibiting any local or special act regulating county business had in mind maintaining essential uniformity in the laws enacted to govern county business, in general, and its administration. For example, the general statutory law provides for certain officers in each of the counties of the state, and defines the duties of such officers. It would be very unwise, for example, to permit local or special laws that would allow a county or counties to abolish the office of county assessor, and transfer his duties to some other officer. Perhaps one county, if same were permissible, would transfer the assessor's duties to the county auditor and recorder, another county, to the sheriff, and another, to some other officer. It may readily be seen that to permit such divergencies and differences in general laws regulating county business would create much confusion, uncertainty and lack of harmony in the official administration of the laws in the various counties, and would be very injurious, detrimental and not conducive to the public welfare. It was such laws of general application as, for

illustration, laws creating the offices of the various county officers and defining their duties, which the framers of the constitution intended should not be interfered with by local or special laws. It was not, manifestly, such an act as the statute of March 27, 1945, an act without any general application whatever, which they intended to prohibit. That statute relates and pertains to, and concerns, only a single item, or project, of county business, and cannot be reasonably construed to be a rule or regulation "regulating county business," because it has no general application.

Now we are confronted with the remaining, and perhaps the principal, question raised by the respondent:

Is the general law of March 20, 1933, the title of which has hereinbefore been stated, applicable, or can said general law be made applicable, to the situation in the instant case, within the meaning of sec. 21 of art. IV of the constitution of the State of Nevada?.

The respondent seriously contends that said general law of 1933, requiring the submission to the electors and taxpayers of the county of the question of whether or not the proposed bond issue should be approved, is applicable, or could have been made applicable, and that the said statute of March 27, 1945, is unconstitutional in that same dispenses with the necessity of submission of such question to a vote of the electors of Washoe County, and is thus in conflict with the said general act of March 20, 1933.

We have hereinbefore set forth in this opinion a statement of the various purposes of said bond issue, as stated in paragraph 8 of the petition herein for a writ of mandate. The respondent has, as hereinbefore stated, admitted, in paragraph I of his answer and return, all matters contained in said paragraph 8 of the petition. We will here repeat the introductory statement of said paragraph 8, which is: "The public health, safety and general welfare require the issuance of the writ herein for the reason that an emergency exists in that the

physical facilities of the Washoe General Hospital are insufficient and inadequate in the following particulars:
* * *."

Notwithstanding this admission in the answer and return, filed December 19, 1946, which, if strictly construed, would preclude respondent from opposing, in his brief filed January 14, 1947, and in oral argument on January 22, 1947, the issuance of the writ, he has, in such argument and in his said brief, strongly opposed same. The admission of the necessity for the issuance of the writ may have been inadvertent, and respondent may have intended only to admit the condition of emergency, and we will so consider it. But his admission of the facts, alleged in said paragraph 8 as constituting the emergency, must, from the very nature of such facts, be deemed an admission that such emergency conditions existed on March 27, 1945, the date of the approval of the statute in question.

The fact that the hospital was constructed many years ago (which is one of the facts admitted by respondent), that it is poorly ventilated, and that, because of a large increase in population, it is overcrowded, its lavatories are overtaxed, and the general conditions are insanitary, are conditions which, to a substantial degree, obviously had been in existence a long time—certainly before March 27, 1945. These conditions, due, in part, to natural deterioration through a period of years, and in part, to inadequacy to meet the demands of a great increase in population, certainly existed to a substantial degree in 1945, and even in the prior war years of 1942, 1943, and 1944. We would be justified in taking judicial notice of the substantial increase in population in Washoe County during the war years, 1941–1945, and continuing through 1946. In view of the nature of the facts admitted, the respondent is not in a position to deny the existence of the emergency conditions at the time the legislature passed the statute of March 27, 1945, and perhaps he does not intend to deny them. The

respondent, however, has argued, in effect, that, even admitting the conditions of emergency, the petitioners, by their having waited from March 27, 1945, the date of the approval of the act, until November 4, 1946, the date they requested the county commissioners to authorize such bond issue, before taking any action pursuant to the act of 1945, have demonstrated, either that an emergency did not, in fact, exist at the time the said 1945 act was passed, or that the petitioners believed the general bond election law of 1933 to afford a sufficient remedy.

Respondent's contention perhaps may be better understood if we quote, at this point, from pages 5 and 6 of his brief. Respondent has there stated:

" * * * It is true, also, that respondent has admitted in his pleadings that an emergency is presently confronting petitioner, but it is the position of respondent that the bond election act of 1933 was in 1945, and is at the present time, capable of meeting such emergency. The Legislature in passing the Act of 1945 must have done so upon the assumption that it was necessary in order to meet the emergency then existing. However, this Court must take judicial notice of the fact that nothing had been done pursuant to the 1945 Act for a period of two years; that the petitioner, though in a position to do so, did not request the Board of County Commissioners to exercise its discretion under the 1945 Act until November 4, 1946, almost two years later. In the light of these undisputed facts, respondent contends that in fact an emergency either did not exist at the time the 1945 Act was passed, or the petitioner believed the general bond election law of 1933 to be a sufficient remedy. Respondent urges that the passage of the Act of March 27, 1945, was a mere trick for the purpose of evading the Act of March 20, 1933, and that the Legislature's reasons for passing the 1945 Act were unsubstantial and purely fanciful. As stated in Washoe County Water Conservation District v. Beemer, 56 Nev. at page 122, 45 P.2d at page 785:

" 'If in the case at bar a clear showing had been made that the passage of the act of February 28, 1935, was a mere trick for the purpose of evading the Act of March 20, 1933, or that the Legislature's reasons for passing the 1935 act were unsubstantial and purely fanciful, the court would have had a different situation presented for its consideration;   *   *   *'

"For this reason, respondent contends that the presumption that the Legislature of 1945 had a reasonable basis for deciding the Act of 1933 to be inapplicable is overcome."

In view of the undisputed facts admitted by the respondent, from which the conclusion is reasonable that an emergency existed in March, 1945, when the act in question was passed, the respondent's contention that the passage of that act "was a mere trick for the purpose of evading the act of March 20, 1933," and that the legislature's reasons . for passing the 1945 act were "unsubstantial and purely fanciful," is unimpressive. It is so inconsistent with respondent's own admission, and with the undisputed facts, that it is purely speculative, and doubtless, the outgrowth of respondent's theory that, notwithstanding the conditions of emergency existing when the act of March 27, 1945, was passed, the act of 1933 (we now quote respondent) "was in 1945, and is at the present time capable of meeting such emergency." As will be shown hereinafter, that was for the legislature to determine, not for respondent, nor for any court. The fact that petitioners waited about one year and eight months before requesting the county commissioners to direct the issuance of the bonds, does not establish, or, fairly interpreted, even indicate any attempt to "deceive or trick" the legislature into passing the act of 1945, nor render the emergency conditions which then existed "fanciful or unsubstantial," nor establish that the hospital trustees, if they requested passage of said act, were not acting in good faith.

The delay in requesting action by the county

commissioners may have been due to good causes or reasons, such as uncertainty as to the attitude of the county commissioners, or unfavorable conditions as to the disposal of the bonds, or other reasons. And we must presume the trustees performed their duties properly, and had such good reasons, in the absence of a contrary showing. As to that, no showing has been made of bad faith on the part of the hospital trustees, nor even of neglect or lack of due diligence, nor that, at the time of the passage of the act, they intended any appreciable delay. But even if the trustees had been negligent in not proceeding earlier, their procrastination would not obliterate or negative the existence of the facts and conditions of emergency, urgently requiring action at the time the legislature passed the act of March 27, 1945. It is apparent that these conditions of emergency were then so dangerous and detrimental to the public health and welfare that action for their speedy improvement was imperative. If the hospital trustees, in March, 1945, urged action by the legislature, they were doing their duty as such officials, and as citizens, to correct a bad and peculiarly impelling situation calling for immediate relief, and they cannot be justly charged with having resorted to any "trick or device" in so acting, merely because the respondent, in the light of the fact of delay which has subsequently occurred in proceeding toward the issuance of the bonds, has evolved a theory that the general act of 1933 "was capable of meeting the emergency." It is, perhaps, only fair to point out the concession of respondent on page 8, near the conclusion, of his brief, as follows: "If an emergency confronted petitioners in 1945, respondent concedes that the Act in question must be constitutional." Assuming the existence of the emergency at the time of the passage of the said statute of 1945 (and we must so assume, because of the existence of the undisputed facts), it was entirely the prerogative of the Legislature to determine whether those facts and conditions were

sufficient to constitute a reasonable basis for the passage of such special or local act.

The legislature, and not the courts, is the supreme arbiter of public policy and of the wisdom and necessity of legislative action. This court has repeatedly upheld the constitutionality of special or local acts of the legislature, passed, in some instances, because the general legislation existing was insufficient to meet the peculiar needs of a particular situation, and, in other instances, for the reason that facts and circumstances existed, in relation to a particular situation, amounting to an emergency which required more speedy action and relief than could be had by proceeding under the existing general law. Among Nevada cases dealing with the question of whether a general law is, or can be made, applicable, to meet a particular situation, and whether or not a local or special law, in the existing situation in a particular case, is unconstitutional, are: Gibson v. Mason, supra; Hess v. Pegg, 7 Nev. 23; State ex rel. Clarke v. Irwin, 5 Nev. 111; Evans v. Job, 8 Nev. 322; State ex rel. Rosenstock v. Swift, 11 Nev. 128, 141; Thompson v. Turner, 24 Nev. 292, 53 P. 178; State v. Lytton, 31 Nev. 67, 99 P. 855; Quilici v. Strosnider, 34 Nev. 9, 115 P. 177, 180; Dotta v. Hesson, 38 Nev. 1, 143 P. 305.

In State v. Lytton, supra, on page 69 of 31 Nev., on page 856 of 99 P., in the opinion by TALBOT, J., it is stated: "Ever since the organization of our commonwealth it has been usual for the Legislature to pass laws relating to particular counties providing for the issuance of bonds in such varying amounts as the exigencies and conditions required for the erection of courthouses and other purposes. Many of these have been enacted since this court held that such legislation was constitutional and valid. At the last regular session of the Legislature acts were passed for the issuance of bonds for new courthouses in three specified counties of the state, and 15 other acts provide for the issuance of bonds for schoolhouses, and other purposes, in different localities.

The most of the indebtedness of the various counties, cities, towns, and districts of the state, and much of which is of long standing, rests upon enactments specially authorizing the issuance of bonds in such instances. The validity of these acts has been considered so extensively, and sustained so often, by this court and the supreme court of the United States that we must consider the matter settled in favor of their constitutionality. State ex rel. Clarke v. Irwin, 5 Nev. 111; Youngs v. Hall, 9 Nev. 212; Thompson v. Turner, 24 Nev. 292, 53 P. 178; Lincoln County v. Luning, 133 U.S. [529,] 532, 10 S.Ct. 363, 33 L.Ed. 766, following Odd Fellows Savings [& Commercial] Bank v. Quillen, 11 Nev. 109."

And in Dotta v. Hesson, supra, Mr. Justice NORCROSS, in the opinion, on page 4 of 38 Nev., on page 305 of 143 P., stated: "since the passage of a special act by the legislature of 1895, providing for the establishment of a county high school for Elko county (Stats. 1895, p. 59), a number of similar acts have been passed authorizing the establishment of such schools in the counties of Churchill (Stats. 1905, p. 144), Lyon (Stats. 1909, p. 145), Humboldt (Stats. 1913, p. 45), White Pine (Stats. 1913, p. 4), and possibly others, inclusive of the act in question. The passage of these several acts shows that the Legislature and the people generally have regarded such acts as not violative of the Constitution as it has been interpreted by numerous decisions of this court. It would be unfortunate indeed if we were now bound to hold this legislation unconstitutional. Whatever room there may have been for argument when the question was first presented as to whether this character of legislation was within the constitutional inhibition, the question can no longer be regarded as an open one. The constitutionality of similar legislation has been before the court repeatedly, and universally sustained. (State v. Lytton, 31 Nev. 67, 99 P. 855, and authorities therein cited; Quilici v. Strosnider, 34 Nev. 9, 115 P. 177.)"

There have been only three cases in this court dealing with the general act of March 20, 1933, providing for submission to a vote of the electors, of a proposal by counties, cities, etc., for the issuance of bonds, namely: State ex rel. Cooper v. Reese, City Clerk, 57 Nev. 125, 59 P.2d 647; Ronnow v. City of Las Vegas, 57 Nev. 332, 65 P.2d 133; and Washoe County Water Conservation District v. Beemer, supra. In State ex rel. Cooper v. Reese, supra, this court held the general act of March 20, 1933, being a later act than the special acts of 1905 and 1913 involved in that case, and which were applicable only to the city of Reno, repealed the special acts, to the extent of the conflict. The constitutional question of applicability was not determined in that case.

In Ronnow v. City of Las Vegas, supra, this court upheld a special act of 1935, Stats. 1935, p. 41, amending the charter act of the city of Las Vegas. It was contended by the respondent in that case that the said special amendatory act of 1935 was, virtually, a reenactment of the statute of 1931 and prior statutes, and, hence, that the general act of March 20, 1933, was later and operated to repeal that portion of the amendatory act of 1935 in conflict with the said general act. The two acts, insofar as the question of requiring a vote of the electors as to the proposed bond issue was involved, were clearly repugnant. The act of 1935 required a submission to a vote of the electors only in the event a petition was signed by a certain percentage of the electors, demanding a special election to pass upon a proposed bond issue. This special act would apply to all future bond issues in the city of Las Vegas, unless repealed, but the court disagreed that same was a mere reenactment of earlier statutes, and held that the said special act of 1935 was the later act and must prevail, notwithstanding the general act of March 20, 1933. The constitutional question was not directly presented to the court in that case, but was necessarily involved. This court, in the opinion by Justice TABER, stated, on page

369 of 57 Nev., on page 147 of 65 P.2d: "The act of 1933 cannot be reconciled with said clause 5 as amended in 1935. The two statutes are so inconsistent and repugnant that they cannot stand together, and it seems clear to us that the Legislature did not intend the general act of 1933 to be applicable, in the City of Las Vegas, to such a bond issue as the one which constitutes the subject matter of this proceeding."

Reverting again to Washoe County Water Conservation District v. Beemer, supra, that case, unquestionably, when considered in relation to the question now confronting us, is more similar to the instant situation than any other heretofore decided by this court.

In the instant case, the act of March 27, 1945, is a special or local law, or both; it was passed later than the general act of March 20, 1933; the facts, circumstances and conditions clearly indicate an emergency exists now and did exist when the said act of 1945 was passed, and we will presume they were the basis of the action of the Legislature in passing said act of 1945; and the constitutional question of whether said general act of 1933 was, or could be made, applicable is directly presented. All of these factors were involved in Washoe County Water Conservation District v. Beemer, supra. In that case, the special act involved was an act approved February 28, 1935, and not the special act of March 27, 1945, involved in the instant case, but there was no difference in principle between the situation in the two cases.

We will now quote further, from Washoe County Water Conservation District v. Beemer, supra, certain statements bearing directly upon the relative functions and powers of the court and the legislature, in considering and determining the constitutionality of a special or local law, when the question involved is whether a general law is, or can be made, applicable, within the meaning of sec. 21 of art. IV of the Nevada constitution. On pages 121, 122 of 56 Nev., on page 784 of 45 P.2d, in the opinion in that case, Justice TABER stated:

"We are accordingly brought to consider whether a general act is or would be applicable. Where there is already a general act such as that of March 20, 1933, hereinbefore mentioned, it is sometimes argued that that fact alone shows that a general act would be applicable; but such is not the law. In Hess v. Pegg, supra, the court said the inference was the other way, and that the very passage of the law raises the presumption that the general act was not and could not be made applicable.

"Whether or not a general law is or would be applicable is for this court to deside; but in the absence of a showing to the contrary, the court seldom goes contra to the very strong presumption that the Legislature has good reason for determining that a general law is not or would not be applicable in some particular cases. Upon this subject the court in Hess v. Pegg, supra, had this to say: 'For this court to oppose its judgment to that of the legislature, excepting in a case admitting of no reasonable doubt, would not only be contrary to all well considered precedent, but would be an usurpation of legislative functions. It cannot be denied that the tendency in some states of this Union is that way, undoubtedly from good motives; but the sooner the people learn that every act of the legislature not found to be in "clear, palpable and direct conflict with the written constitution," must be sustained by the courts, the sooner they will apply the proper correction to unjust or impolitic legislation, if such there be, in the more careful selection of the members of that branch of the state government to which they have delegated and in which they have vested the "legislative authority" of this state. No court should, and this court will not, step out of the proper sphere to undo a legislative act; and therein, no court should, and this court will not, declare any statute void because unconstitutional, without clear warrant therefor.'

"If in the case at bar a clear showing had been made that the passage of the Act of February 28, 1935, was a

mere trick for the purpose of evading the Act of March 20, 1933, or that the Legislature's reasons for passing the 1935 act were unsubstantial and purely fanciful, the court would have had a different situation presented for its consideration; but no such showing having been made, and the court being unable, after considering the Act of February 28, 1935, and the record in this case, to say that it is clearly satisfied that a general act could be made applicable, it becomes the duty of the court to abide by the presumption that the legislative branch of the state government had a reasonable basis for deciding that a general act would not be applicable, and that it was proper to pass the Act of February 28, 1935, in order to meet the particular and peculiar situation with which it was dealing."

For the reasons indicated, it is clear that we would not be justified in holding, in the instant case, that the general act of March 20, 1933, was, or could have been made, applicable to meet the peculiar and particular situation in the nature of, or analogous to, an emergency, which existed March 27, 1945, and still exists, nor that the provisions of said general act of 1933 were adequate for that purpose and that the said act of 1945 is unconstitutional. To so hold, we would have to be convinced, beyond a reasonable doubt, of the applicability of the said general act and the unconstitutionality of the said special act, and we are not so convinced.

It is, therefore, ordered that the peremptory writ of mandamus issue.

EATHER, C. J., concurs.

TABER, J., died February 6, 1947, and successor not yet qualified.