COUNTY OF CLARK, a Legal Subdivision, and LEG-ISLATIVE COMMISSION OF THE STATE OF NEVADA, Appellants, *v.* CITY OF LAS VEGAS, a Municipal Corporation, and GEORGE E. FRANK-LIN, Respondents.

No. 8719

June 7, 1976                      550 P.2d 779

---

[1]Mr. Justice Mowbray did not participate in the consideration and resolution of this appeal.

*Bruce L. Woodbury,* of Las Vegas, for Appellant County of Clark.

*Frank Daykin,* of Carson City, for Appellant Legislative Commission of the State of Nevada.

*Carl E. Lovell,* City Attorney, and *John Foley,* of Las Vegas, for Respondent City of Las Vegas.

*George E. Franklin,* of Las Vegas, on Behalf of Himself, et al.

## OPINION

By the Court, GUNDERSON, C. J.:

By Chapter 648, 1975 Statutes of Nevada, our Legislature adopted the "Metropolitan Cities Incorporation Law" and the "Urban County Law." The former is Sections 2 through 110.6 of Chapter 648; the latter is Sections 111 through 136.[1] Together, these provisions endeavor to allow the City of Las Vegas and certain conjacent areas of Clark County to achieve a substantial consolidation of governmental functions and services, while Clark County, Las Vegas, and certain smaller cities within the county remain distinct governmental entities.

Soon after Chapter 648's passage, heated public debate arose concerning its constitutionality. Responding to an inquiry restricted to the most obvious constitutional questions presented thereby, Nevada's Attorney General declared it unconstitutional in part.[2] Disputes multiplied, and on November 7, the City of Las Vegas filed a complaint against Clark County, purporting to seek a declaratory judgment as to the constitutionality of selected provisions.[3] On December 8, George E.

---

[1]The entire chapter has 172 sections. Sections 137 through 158 undertook to amend portions of the Nevada Revised Statutes affected by the Metropolitan Cities Incorporation Law or the Urban County Law. Sections 159 through 162 sought to organize the City of Las Vegas under the Metropolitan Cities Incorporation Law. Sections 163 through 169 are the focal point of this appeal and are summarized herein. Finally, Sections 170 through 172 are miscellaneous provisions not greatly pertinent to issues raised herein.

[2]See: AGO No. 194 (1975).

[3]Some question exists whether the action brought by the City of Las Vegas tenders a bona fide "case or controversy." According to one local newspaper, "In reality, both city and county commissioners want to see the merger put into effect, but its constitutionality must be tested by the Nevada Supreme Court before they are willing to throw themselves wholeheartedly into the effort. See: Las Vegas Review-Journal, Feb. 2, 1976, at 2. In somewhat analogous circumstances, in Muskrat v. United States, 219 U.S. 346 (1911), the United States Supreme Court ordered certain actions dismissed for want of jurisdiction, saying:

". . . The whole purpose . . . is to determine the constitutional validity of this class of legislation, in a suit not arising between parties concerning a property right necessarily involved in the decision in question, but in a proceeding against the Government in its sovereign capacity, and concerning which the only judgment required is to settle the doubtful character of the legislation in question. Such judgment will not conclude private parties, when actual litigation brings to the court the question of the constitutionality of such legislation." Id. at 361–362.

Franklin, in his capacity as a citizen, voter and taxpayer of Las Vegas and Clark County, filed a separate action for declaratory relief, joining both City and County, and seeking an adjudication that Chapter 648 is totally unconstitutional, and void in its entirety.[4] Through a stipulation approved by the district court, the two lawsuits were consolidated, and the Legislative Commission of the State of Nevada was permitted to intervene as an additional defendant. From a judgment declaring the entire Chapter unconstitutional, Clark County and the Legislative Commission have appealed.

The district court determined that Chapter 648, in crucial respects, violated provisions of our state and federal constitutions, and that with unconstitutional sections excised, the legislative intent was thwarted, thereby rendering the entire Chapter void. We affirm the district court's judgment, for the reasons it articulated, and for further reasons.

# I

## Special Legislation Question

First, the district court found Sections 163–168 of Chapter 648 to be special legislation, violative of Article IV, Sections 20 and 21, of the Nevada Constitution.[5] As all members of the Nevada Supreme Court agree, this determination was correct.

Section 163 would divide Clark County into seven commissioner districts, from which a total of eleven commissioners would be elected: eight "county-city commissioners" and three "county commissioners." The composition of each district is specified by reference to the assembly districts established by

---

[4]Inasmuch as Mr. Franklin's action distinctly presents a bona fide dispute, we need not determine whether the City's action against the County constitutes a true "case or controversy."

[5]The Nevada Constitution, Article IV, Section 20, provides in material part:

"The Legislature shall not pass local or special laws in any of the following enumerated cases—that is to say:

". . .

"Regulating county and township business;

"Regulating the election of county and township officers;

". . .

"Providing for opening and conducting elections of state, county, or township officers, and designating the places of voting;

". . ."

The Nevada Constitution, Article IV, Section 21, provides:

"In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the State."

Chapter 218 of NRS.[6] Section 164 concerns elections to be held in Clark County in 1976 and 1978, to elect the eight "county-city commissioners" and the three "county commissioners." Section 165 provides for the creation in Clark County of citizens' advisory councils, two in each of the four two-seat "county-city commissioner" districts, and one in each of the three one-seat "county commissioner" districts. Section 166 would create a "special local government consolidation committee" composed of the present seven members of the Clark County Board of Commissioners (in office on the Act's effective date), and the mayor and four members of the Las Vegas Board of City Commissioners (in office on the first Monday in July, 1975). Section 167 enumerates governmental services and functions to be performed individually or jointly by each

[6]"Sec. 163.   1. Notwithstanding the provisions of subsections 4 to 6, inclusive, of section 126 of this act, for the purpose of electing the 11 members of the board of county commissioners of Clark County and the eight members of the board of commissioners of the city of Las Vegas, there are hereby created seven commissioner districts as follows:

"(a) Commissioner district A shall be composed of assembly districts Nos. 1, 2, 5 and 13, from which there shall be elected two county-city commissioners.

"(b) Commissioner district B shall be composed of assembly districts Nos. 3, 4, 6 and 8, from which there shall be elected two county-city commissioners.

"(c) Commissioner district C shall be composed of assembly districts Nos. 9, 11, 14 and 20, from which there shall be elected two county-city commissioners.

"(d) Commissioner district D shall be composed of assembly districts Nos. 10, 12, 15 and 16, from which there shall be elected two county-city commissioners.

"(e) Commissioner district E shall be composed of assembly districts Nos. 7 and 17, from which there shall be elected one county commissioner.

"(f) Commissioner district F shall be composed of assembly districts Nos. 18 and 19, from which there shall be elected one county commissioner.

"(g) Commissioner district G shall be composed of assembly districts Nos. 21 and 22, from which there shall be elected one county commissioner.

"2.   'Assembly districts,' as used in subsection 1, refer to and have the meaning conferred by the appropriate provisions of chapter 218 of NRS.

"3.   The commissioner districts created by subsection 1 shall not be expanded upon, altered or abolished except by act of the legislature or pursuant to an order of a court of competent jurisdiction, in which event the board of county commissioners of Clark County shall apportion itself in the manner prescribed in subsections 4 to 10, inclusive, of section 126 of this act."

entity. Section 168 requires that the labor negotiating representatives of both Las Vegas and Clark County participate jointly in labor negotiations with any employee organizations.

The appellants, while conceding that the sections just mentioned constitute local or special legislation, contend they have only temporary application, and therefore do not offend the constitutional prohibition. A review of the cases cited in support of this proposition is unpersuasive. See: Cauble v. Beemer, 64 Nev. 77, 177 P.2d 677 (1947); Conservation District v. Beemer, 56 Nev. 104, 45 P.2d 779 (1935); State v. Ruhe, 24 Nev. 251, 52 P. 274 (1898); State of Nevada v. Swift, 11 Nev. 128 (1876); State of Nevada v. Irwin, 5 Nev. 111 (1869).

Appellants also urge that Sections 163 through 168 do not violate Nevada's constitution for the reason that emergency circumstances existed, necessitating legislative interference with county government by special legislation, ostensibly because no general laws sufficiently addressed the supposed emergency. See Quilici v. Strosnider, 34 Nev. 9, 115 P. 177 (1911). However, we note that Chapter 648, exclusive of Sections 163 through 168, contains provisions for the election of county officers which ostensibly apply uniformly throughout the state. (See Section 126 of Chapter 648.) Chapter 648 therefore itself constitutes persuasive evidence that a "general law can be made applicable" as contemplated by Article IV, Section 21 of the Nevada Constitution. Thus, there exists no apparent need for special legislation in this field; and in any event, we perceive no emergency here, much less one of sufficient magnitude to justify special legislation so pervasive as Sections 163 through 168.

Laws establishing county governments or purporting to regulate internal affairs of such governments must be general in nature and must apply uniformly through the state to all counties similarly situated. Nothing less satisfies the mandate of Article IV, Sections 20 and 21 of the Nevada Constitution. State v. Malone, 68 Nev. 36, 231 P.2d 599 (1951); McDonald v. Beemer, 67 Nev. 419, 220 P.2d 217 (1950). In McDonald v. Beemer, this Court noted the evils which attend legislation directed at one locality:

"[Such legislation] is invariably referred to the local members and passed without scrutiny from the other representatives and without any feeling of responsibility on their part, thus

often leading to improper combinations among the members and even to vicious legislation that would not be permitted were it to affect the whole state." 67 Nev. at 426, 220 P.2d at 220.

Therefore, because Sections 163 through 168 apply specifically to Clark County, and to no other county in the state, they must be declared void.

## II

*Malapportionment "One Man, One Vote" Questions*

1. Moreover, as all members of the Nevada Supreme Court agree, Section 163 offends the "one man, one vote" concept implicit in the Nevada and U.S. Constitutions. See: Nevada Constitution, Article I, Section 13; U.S. Constitution, Amend. 14. This is so, we think, because the new commissioner districts were created in 1975 by reference to existing assembly districts, previously established on the basis of 1970 census figures.

Section 163 divides Clark County into seven commission districts. Two county-city commissioners are to be elected from each of the four commissioner districts, which are each composed of four established assembly districts; one county commissioner is to be elected from each of the remaining three districts, all composed of two established assembly districts. The population of Clark County was apportioned into the various assembly districts on the basis of the 1970 Federal Decennial Census, and all parties agree that changes in population since 1970 have caused significant malapportionment between the various assembly districts. Thus, utilizing the existing assembly districts to form commission districts would immediately occasion significant malapportionment in the latter.[7] All parties seemingly further agree that more recent and accurate population estimates are available upon which a districting plan could be based.

Unquestionably, if a basis of apportionment or reapportionment is adopted which does not reasonably assure adequate protection of the integrity of the individual's vote, the "one man, one vote" concept is violated. Gaffney v. Cummings, 412

---

[7] If the plan were implemented, the disparity in population between the commission districts would range from —20.2 percent to 25.2 percent of norm.

U.S. 735 (1973); Abate v. Mundt, 403 U.S. 182 (1971). Clearly, the Nevada and United States Constitutions require strict compliance with the "one man, one vote" concept whenever possible. It has, of course, been held that a periodic reapportionment scheme based on the Federal Decennial Census is a reasonable means of safeguarding the integrity of the individual's vote from degradation resulting from malapportionment, although at times some measure of malapportionment might exist. Silver v. Reagan, 432 P.2d 26 (Cal. 1967). Still, we think, periodic reapportionment must be distinguished from initial apportionment. The authorities appellants cite, approving use of the decennial census, do so in the context of the former. None are cited that approve use of an antiquated census which admittedly would result in significant malapportionment in an initial plan of apportionment.

It may be true that reapportionment every ten years based on population changes is "reasonable" as that term is necessarily defined by the courts. See Silver v. Reagan, cited above. Still, it does not follow that initial apportionment based on outdated population data is reasonable. In the former situation, the data is accurate at the time of apportionment; in the latter, as here, the data may be quite stale. It is recognized that to require reapportionment more frequently than every ten years might impose on government burdens unreasonable in relation to the benefits achieved. See Gaffney v. Cummings, cited above. However, in the context of a plan for initial apportionment, such a burden does not necessarily exist.

How does one justify an initial apportionment based on an outdated census, resulting in significant malapportionment, when admittedly more accurate figures are available which will result in no significant malapportionment? Here, this question has compelling constitutional significance, since no justification whatever, in support of using the older population figures, is offered or can be perceived. See Groh v. Egan, 526 P.2d 863 (Alaska 1974); Calderon v. City of Los Angeles, 481 P.2d 489 (Cal. 1971). Thus, we hold that it was constitutionally impermissible to base an initial apportionment for the new commissioner districts on admittedly outdated and inaccurate population estimates, when more recent and accurate estimates were just as readily available. See Silver v. Reagan, cited above; see also, Avery v. Midland County, 390 U.S. 474 (1968); Reynolds v. Sims, 377 U.S. 533 (1964).

2.  Also, as the district court saw, the fact that Section 163 would create the new "county-city commissioner" districts through reference to existing assembly districts, rather than conforming such districts to the Las Vegas city limits, offends the "one man, one vote" concept in yet other ways.[8] Notably, more than 12,500 residents of the City of Las Vegas residing in proposed Districts E and F would be voting merely for a "county commissioner" rather than a "county-city commissioner." In other words, these Las Vegas residents would be totally divested of any voting franchise whatever, as to selection of the "county-city commissioners" who would ostensibly represent them in municipal affairs. Moreover, more than 7,500 persons who are not Las Vegas residents, but who live in Districts A, B or C, would vote for a "county-city commissioner," rather than for a mere "county commissioner."[9] Thus, the votes of over 7,500 non-residents would dilute the voting franchise of those Las Vegans who were not totally divested of all elective privileges as to city representatives.

In our view, as the United States District Court for the District of Nevada has heretofore declared:

"Where votes of citizens are 'watered-down' solely because of their residence in one political subdivision rather than another, such difference in weight of vote is an invidious discrimination against the least favored voter, and unconstitutional because violative of the Equal Protection Clause, as well as the Fifteenth and Nineteenth Amendments, which require,

---

[8]As hereinafter discussed in Point IV of this opinion, we also believe Chapter 648 offends the "one man, one vote" concept in still another, somewhat less obvious, but equally unacceptable way not noticed by the district court.

[9]According to the Clark County Regional Planning Council's population estimates, 1,431 of these favored non-residents of Las Vegas reside in North Las Vegas. Thus, they would not only be allowed to vote for a "county-city commissioner," with a voice in Las Vegas city affairs, but also could participate in elections held for the North Las Vegas city council. Also among the 7,500-plus non-residents who would vote for Las Vegas county-city commissioners, while 9,500-plus Las Vegans could not do so, would be some 2,000-plus persons in such distant communities as Indian Springs, Mount Charleston, Blue Diamond, Red Rock, and Mountain Springs.

Indeed, the Regional Planning Council's figures reflect that six of the eight Las Vegas "county-city commissioners" could themselves be non-residents of Las Vegas, residing either in uniquely favored portions of North Las Vegas, or in unincorporated areas of Clark County as much as 45 miles away.

stated in shorthand, 'one man, one vote.' " Dungan v. Sawyer, 250 F.Supp. 480, 487 (D.Nev. 1965).

Clearly, therefore, the district court correctly determined that the "one man, one vote" concept was offended by the scheme just mentioned; and it is no answer to suggest that the legislature might, if it wished, determine to have municipal affairs governed by an appointive board. As a general rule, "whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given equal opportunity to participate in that election." Hadley v. Junior College District, 397 U.S. 50, 56 (1970)

## III

### *Severability Question*

Appellants urge that, even though Sections 163 through 168 of the Act may be unconstitutional and void, we should hold those sections to be severable and sanction implementation of the remainder through agreements between the local governmental entities, and through edicts of this court. For reasons now to be stated, we consider such action legally inappropriate.

It is true that the Legislature's draftsmen included in Chapter 648 a so-called "severability clause," which recites: "If any portion of this act is held to be unconstitutional or invalid for any reason by the decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portion of this act. The Legislature hereby declares that it would have passed this act and each portion thereof, irrespective of the portion which may be deemed unconstitutional or otherwise invalid."

However, upon both the highest authority and the weight of authority, it seems well settled that this kind of scriveners' "boiler-plate" neither divests courts of the power, nor relieves them of the duty, to determine whether indeed the remainder can stand independently, and whether the Legislature as a body would intend that it should do so. See, for example: Dorchy v. Kansas, 264 U.S. 286 (1924); Carter v. Carter Coal Co., 298 U.S. 238, 312–313 (1935); Santa Barbara School District v. Superior Court, 530 P.2d 605, 617–618 (Cal. 1975); Lynden Transport, Inc. v. State, 532 P.2d 700,

711–713 (Alsaka 1975); American Waterways Operators, Inc. v. Askew, 335 F.Supp. 1241, 1250 (M.D.Fla. 1971; 3-judge panel); Whitehill v. Elkins, 287 F.Supp. 61, 64–65 (D.Md. 1968; 3-judge panel); City of Baltimore v. A. S. Abell Co., 145 A.2d 111, 120 (Md. 1958); Burton v. City of Hartford, 127 A.2d 251, 255–256 (Conn. 1956). In accord: 2 Sutherland, Statutory Construction, 182, 184, 185 (3rd ed.).

All such clauses properly do, according to the authorities and scholars, is to replace the commonly recognized presumption of non-severability with one of severability which, it has been noted, is at best "slight" and entitled to little weight. See, for example, Lynden Transport, Inc. v. State, cited above, at 712. In words often quoted, Professor Sutherland has observed: "Separability clauses should be given reasonable consideration, but should not, at least under present usage, be paid undue homage." P. 185.

The United States Supreme Court has adhered to the prevailing view just mentioned, even when faced with a statutory provision reciting a "conclusive presumption" that each provision was severable from all others. Speaking through the eminent Mr. Justice Brandeis, the High Court said in a unanimous opinion:

"But a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall. . . . [A severability clause] provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely; not an inexorable command." Dorchy v. Kansas, cited above, at 290.

The United States Supreme Court's two-pronged test of severability is in accord with the other authorities, cited above. For example, in our sister state California, the Supreme Court recently said: "The final determination depends on whether 'the remainder is [1] . . . complete in itself and [2] would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute.' " Santa Barbara School District v. Superior Court, cited above, at 618. Again, quoting Mr. Justice Brandeis, the Alaska Supreme Court held last year: "The test for determining the severability of a statute is twofold. A provision will not be deemed severable 'unless it appears both that, standing alone, legal effect can be given to

it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.' " Lynden Transport, Inc. v. State, cited above, at 713. Any suggestion that when a severability clause is present, "the test of severability in practical effect is reduced to one element," simply is contrary to prevailing legal authority. We therefore feel constrained to reject any suggestion that this court should sustain the remainder of Chapter 648, merely because that remainder might be mechanically severed from obviously objectionable portions, and thereafter somehow implemented through intervention of this court and of local authorities. Accordingly we turn to consider the question of severability under the recognized test, which we endorse.

1. First, we note that with Sections 163 through 168 excised, it does not appear that, standing alone, legal effect can be given to the remainder of Chapter 648 consistently with established law and legal principles. Instead, implementation would at best require Procrustean restructuring of the law by this court and by local authorities in order to comport with constitutional principles, which may not be possible at all.

In this regard, we notice that, although stated in ostensibly general terms, Section 126 like Section 163 requires a board of county commissioners consisting of 11 members. Again, as special counsel for the county acknowledges in his brief, Section 126 contemplates four "two-commissioner districts, which is explicit in Section 163 and implicit in Section 126 (seven districts for the election of eleven commissioners)." These requirements, which obviously can be attributed only to visions of what should occur in Clark County, seek to implement an improper districting plan clearly unconstitutional under Section 163, and less obviously but equally so as set forth in Section 126. The latter, ostensibly general districting provision declares: "Those members of the board of county commissioners elected from the county commissioner districts situate within *or substantially within* the corporate boundaries of a city organized under the Metropolitan Cities Incorporation Law shall be concurrently elected as the members of the board of commissioners of the city." Section 126(2); *emphasis added.* Section 13(2) contains identical language. Thus, Sections 13(2) and 126(2), like Section 163, would contemplate that depending upon whether or not they were assigned to a district "substantially within the corporate boundaries" non-residents might vote, and residents might not be allowed to vote, for "county-city commissioners."

Thus, we think, Sections 13 and 126 are not only patterned

upon Section 163, but contemplate a districting plan with identical constitutional faults. Obviously, to save Sections 13 and 126, we would therefore not only have to sever them and the rest of Chapter 648 from Sections 163–168, but then would be obliged to restructure 13 and 126 also. Only by imposing requirements clearly contrary to the legislative intent upon them, i.e., requirements that "county-city commissioner" districts be wholly within the "metropolitan city," and that "county commissioner" districts be entirely outside, could we begin to save the ostensibly general districting provision from the same manifest unconstitutionality with which Section 163 is afflicted.

Moreover, even were we willing to take this step, still in Clark County it might be impossible to utilize Section 126 to achieve the Legislature's plan for that area as originally expressed, to-wit: that eight county-city commissioners from the four large districts should govern the metropolitan area. Application of the "one man, one vote" concept might well require that some of the eight "county-city commissioner" seats be downgraded to "county commissioner" seats, and elected solely by voters from outside Las Vegas. See, Point II, above.

Furthermore, of course, even were this court to restructure Sections 13 and 126 to eliminate the above concerns, we note it would not now be possible for this court to order either a redistricting which would comply with Section 126(4),[10] or an election which would comply with section 99.[11] As Nevada's Attorney General pointed out in his written opinion dated October 8, 1975, it was essential to any possible compliance with Section 126(4) that the county adopt a constitutional

---

[10]"4. The board of county commissioners existing at the time a city therein becomes organized under the Metropolitan Cities Incorporation Law, subject to the prior approval of the existing governing body of such city, shall, not less than 90 days next preceding the last day for filing an affidavit of candidacy for the next general election following such organization, adopt an ordinance dividing the county into seven county commissioner districts."

[11]"Sec. 99. 1. All elections held under this chapter shall be governed by the provisions of the election laws of the state, so far as such laws can be made applicable and are not inconsistent with this chapter.

"2. The conduct of all municipal elections shall be under the control of the board of commissioners: The board of commissioners shall adopt by ordinance all regulations which it considers desirable and consistent with law and this chapter for the holding and conduct of municipal elections, for the prevention of fraud therein, and for the recount of ballots in cases of doubt or fraud."

districting plan no later than April 22, 1976.[12] This case was not even submitted to us until April 27, and were we now to order redistricting and an election pursuant thereto, we would thereby have to accede to violation of the express time limitation specified in Section 126(4) itself, and accept the prospect of ignoring numerous other time limitations referred to by Section 99. See, for example: NRS 293.176; 293.177(1); 293.180(1); 293.183; 293.187; 293.200(5); 293.200(9); 293.205; 293.309(1); 293.560; 293.563.

For these reasons, therefore, and several others, we do not believe that Chapter 648 can be implemented through the ostensibly general provisions of Section 126, consistently with our law and constitutional principles. The first phase of the established two-pronged test of severability is, therefore, not satisfied. Even so, we turn to consideration of the second phase of that test.

2.   As the district court saw, the Legislative proponents of Chapter 648 clearly drafted it with intent that Clark County would be governed as provided in Section 163, and not by Sections 13 and 126, either in their original form or as this court would have to restructure them to meet the "one man, one vote" objections heretofore discussed. Thus, we think the district court made the proper inquiry, and thereupon took the action contemplated by the decisions heretofore cited.[13] If

---

[12]Attorney General List expressly noted:

"The city should complete its action to organize under the Metropolitan Cities Incorporation Law in sufficient time to enable the county commissioners to adopt a districting ordinance by no later than April 22, 1976. This would comply with the requirements of Section 126(4) of Chapter 648 that a districting ordinance be enacted by the county commissioners no later than 90 days before the last day for filing affidavits of candidacy for the next general election following the organization of the city. The last day for filing affidavits of candidacy for the next election is the third Wednesday in July, or July 21, 1976. NRS 293.177 and 293.200." AGO No. 194, p. 6, n. 2 (1975).

Thus, while the Attorney General thought portions of Chapter 648 could be implemented, he recognized implementation would have to conform to Nevada law, which is not now possible.

[13]It appears to us that the district judge predicated his ruling upon a number of sound considerations, including that articulated by Mr. Justice Sutherland of the United States Supreme Court. In his written decision, Judge Wendell noted:

"The Court finds that the heart of SB 601 is found in Sections 163 through 167. They were enacted by the legislature with full knowledge that corresponding sections appeared in the general law, Sections 126, 129 and 135, which could govern and would govern any other city and

the total Legislature had become aware of all the various constitutional infirmities already discussed herein—so that a motion had been made and passed to strike the manifestly unconstitutional portions of Sections 163 through 168, and of Sections 13 and 126—we do not believe the Legislature would thereupon have been willing to pass the remainder without restructuring something better.[14] Nor are we at all persuaded that our Governor would, under such circumstances, have signed Chapter 648 into law.

Therefore, also under the second phase of the two-pronged test generally recognized, we hold that constitutionally objectionable portions of Chapter 648 are not severable from the unconstitutional provisions hereinbefore discussed.

---

county coming within the act. The legislature chose to provide that Sections 163 through 167 would govern in Las Vegas and Clark County notwithstanding these other Sections.

"The Court further finds that it is apparent that the legislature did not intend for Clark County to district itself, conduct an election, and after the election, at the option of the city commissioners and the county commissioners, decide the manner of dividing services and functions within the county.

"The Court finds that if the legislature had intended the provisions of the general act to apply in Clark County they would not have enacted Sections 163 through 168.

"The Court further finds that the legislature would not have enacted SB 601 without Sections 163 or through Sections 168, nor would it now be satisfied with the Act with those sections stricken. The Court further finds that the legislature would not have enacted SB 605 or SB 620 without SB 601."

Thus, Judge Wendell's last words echo those of Mr. Justice Sutherland: "Perhaps a fair approach to a solution of the problem is to suppose that while the bill was pending in Congress a motion to strike out the labor provisions had prevailed, and to inquire whether, in that event, the statute should be so construed as to justify the conclusion that Congress, notwithstanding, probably would not have passed the price-fixing provisions of the code." Carter v. Carter Coal Co., cited above, at 313.

[14]We note that the record affirmatively shows a number of legislators and their constituents were apprehensive of Chapter 648, and acceded to it only after one of its chief legislative proponents assured them that "this bill has only application in the situation that has developed in the metropolitan areas of Clark County," and that "the committee sees no application of this bill in any other part of the State in the foreseeable future." Certainly, this fact alone provides substantial reason to believe concerned legislators would not have voted for the scheme, of which they admittedly were "apprehensive," if it had been presented in a more general and therefore more menacing form. See again, McDonald v. Beemer, cited above, in Point I.

## IV

### *Built-In Bias Question*

We turn next to another subtler, but equally serious constitutional infirmity which it is argued would result regardless of whether governmental "consolidation" in Clark County be implemented under Sections 13 and 126, rather than 163.

Now, we will consider whether those sections, which likewise contemplate that Las Vegas residents will elect a predominant number of "county-city commissioners" to serve on both city and county governing boards, are constitutionally sound; or whether, to the contrary, such a scheme of local government violates constitutional principles by denying disfavored residents of North Las Vegas, Henderson, and Boulder City, and unincorporated areas of Clark County, equal access to the political system. As Nevada's able new Legislative Counsel acknowledges, all of Chapter 648 must fall if, in the context of this case, its provisions for two types of commissioners, of whom a minority are granted lesser perquisites than the majority, constitute an invidious discrimination against citizens who can vote only for one of the less potent commissioners. As the Legislative Counsel perceives, there is no possibility that these fundamental provisions could be "severed" from Chapter 648 as a whole.

At the outset, we note that there of course is no absolute constitutional prohibition against consolidating city and county offices. (See, for example, State of Nevada v. Swift, 11 Nev. 128 (1876), which concerned legislation initially incorporating Carson City, and empowering the Sheriff of Ormsby County to act as ex-officio marshal of Carson City.)[15] However, this does not foreclose the prospect of an inherent constitutional infirmity.

At the outset, we also reject any suggestion that a plan comparable to the one contemplated here was considered and

---

[15]In the *Swift* case, this court noted: "The duties imposed upon them as city officers are of the same character as those which they are respectively required to perform as county officers, and there is no constitutional inhibition against the exercise of the duties of a municipal office by a person holding a county office, when the duties of each are of the same character." 11 Nev. at 139.

The instant legislation mixes duties which are inherently of a different nature. *Swift* involved executive and ministerial duties, whereas the NRS Chapter 648 in reality lumps the legislative function of the county with that of its major city.

approved by the High Court in Abate v. Mundt, 403 U.S. 182 (1971). The reapportionment plan approved in *Abate* was based on population figures. There an 18-person county legislature was chosen from five districts. Each district contained one of the five towns within the county. The only mention of a "dual board" was under the previously existing plan. Under that plan, the town supervisors from *all* towns, which encompassed the entire county, were also county supervisors.

In its decision, the High Court stated: "We emphasize that our decision is based on the long tradition of overlapping functions and dual personnel in Rockland County government and on the fact that the plan before us does not contain a built-in bias tending to favor particular political interests or geographic areas. And nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality. But we are not prepared to hold that the Rockland County reapportionment plan violates the Constitution, and, therefore, we affirm." 403 U.S. at 187.

No "long tradition of overlapping functions and dual personnel" exists in Clark County. Further, as will be hereinafter discussed, and as the Legislative Counsel has virtually acknowledged, the "county-city commissioner" system of NRS Chapter 648 contains "a built-in bias tending to favor particular political interests." This in mind, we turn to consider the plan at hand.

It is, of course, well established that the right to vote is fundamental in a free democratic society. Every citizen has an unalienable right to full, *effective* participation in the political process. Whitcomb v. Chavis, 403 U.S. 124 (1971); Reynolds v. Sims, 377 U.S. 533 (1964). Thus, a voter has the constitutional right to have his vote given as much weight as any other vote and not to have his vote denied, debased, or diluted in any manner. Hadley v. Junior College District, 397 U.S. 50, 52 (1970). These principles are applicable to the local government process. Avery v. Midland County, 390 U.S. 474 (1968). Any alleged infringement of this right must be carefully and meticulously scrutinized. Reynolds v. Sims, cited above.

Appellants apparently believe that if the commissioner districts were somehow apportioned with equal population, the "one man, one vote" principle would be satisfied. We believe, however, that any such mechanical treatment of fundamental

rights is unsatisfactory. Equal apportionment is merely the starting point of any consideration. Reynolds v. Sims, cited above. Population, itself, does not possess any talismanic quality in fair representation cases. Indeed, "to rely upon population statistics, to the exclusion of all other factors, is to give these statistics greater sanctity than that which the law permits or requires." Zimmer v. McKeithen, 485 F.2d 1297, 1303 (5 Cir. 1973). Even an equally apportioned scheme can be objectionable where it operates to cancel, minimize, or dilute the voting strength of a political interest group. Whitcomb v. Chavis, cited above at 143; Zimmer v. McKeithen, cited above. We must, therefore, look behind the equal apportionment aspect and ascertain whether Chapter 648 would cancel, minimize, or dilute the voting strength of residents outside the corporate limits of Las Vegas.

The scheme of local government set forth in Chapter 648 does not require complete consolidation of city and county government, but, instead, provides for two different governing boards, one for each entity. The city board consists of commissioners elected from districts within the municipal boundaries—or, as Section 126 originally was written, "substantially within" such boundaries. In addition, these same individuals also serve on the county board. Thus, a voter within one of these districts is electing a representative who will be serving his or her interests on two different boards. In contrast, a voter residing in a district outside the major city would elect a representative who serves his or her interests only on the county board.

Las Vegas provides a splendid example of how dilution of one's voting strength will occur. There, a majority of the commissioners (originally specified as eight in number) would be elected to govern the city. That same majority also would sit on the eleven-man county board. At a city board meeting, the majority could decide to take action deemed in the best interest of the city constituency, without thought to detriment that might result to the balance of the county. They then could "switch hats" and go to the county board meeting to affirm their previous action, purporting to act in the best interests of the entire county.

In these circumstances, the possible incursion of bad faith surely is a disturbing prospect; however, even though the county-city commissioners might attempt to act in total good faith, decisions or compromises reached at city board meetings would inevitably tend to restrict meaningful discussion and compromise at later meetings of the county board. Once the

Las Vegas county-city commissioners determined the destinies of both the city and the county at a city commission meeting, the subsequent county commission meeting would be a matter of form, in many if not in all cases. Later efforts by the minority "county commissioners," to change earlier decisions, would at worst be totally foreclosed whenever the county-city commissioners had arrived at firm understandings, express or tacit, in reaching their consensus. At best, efforts to gain a reconsideration would likely be hampered because individual county-city commissioners, having already considered the issue, would already have made up their minds. In short, under the dual commissioner system structured in Chapter 648, the county-city commissioners would effectively control the development and growth of the major city, of the county, and of other cities within the county—paying little or no heed to the mere county commissioners, just as they might choose. As compared to county-city commissioners, the county commissioners, therefore, would have a severely diminished capacity to represent their constituents' interests.

Access to the political process is the barometer of dilution of voting strength. Zimmer v. McKeithen, cited above. Can it be said that a voter in North Las Vegas, Henderson, Boulder City or the unincorporated county areas has access to the political process merely because he or she can participate in the election of a representative, when the statutory scheme denies that representative an effective voice in governmental affairs? Manifestly, it cannot. This is not the situation where an interest group has found itself outvoted and is thus without representation. See Whitcomb v. Chavis, cited above. On the contrary, while residents outside Las Vegas would elect representatives, those representatives would be without effective political power to protect county interests conflicting with policies established by the county-city commissioners acting in a vacuum on the city board. These lesser, second-class commissioners could not provide representation responsive to the needs of the county. This dilutes the votes of all those not favored by the plan, Zimmer v. McKeithen, cited above, and we believe the dilution of one's vote merely because he or she resides outside Las Vegas impairs basic constitutional rights just as much as invidious discrimination based on such factors as race or economic status. Reynolds v. Sims, cited above.

During oral argument, Mr. Daykin, the Legislative Counsel,

admitted that the "county-city commissioners" could take unconscionable advantage of the "county commissioners."[16] However, as apologia, Mr. Daykin suggested: (1) that we must have faith in our elected officials; and (2) that the possibility of unconscionable action exists even with independent boards.

To the contrary, we believe that our constitutional form of government does not proceed upon gratuitous assumptions of good faith. Instead, fundamental to our government is the checks and balance system inherent in separation of power. Our Constitution, as its preamble recites, is intended to "*secure the Blessings of Liberty to ourselves and our Posterity.*" Where one group's political rights are left insecure, and another group is empowered to trample those rights at will, we believe that it is no answer, from a Constitutional standpoint, to say the former should not complain but should have trust in their fellow men and women.

Of course, it is true that the possibility of unconscionable action also exists even with independent boards, just as unconscionable action is possible in most governmental affairs. However, the scheme envisioned by Chapter 648 facilitates, almost mandates, the commissioners representing the county's largest city to take unconscionable advantage, to resolve matters among themselves, to become insensitive to the views of mere county commissioners. Under Chapter 648, effective debate on a city issue affecting the county can be foreclosed by a city meeting held prior to the county meeting. With independent boards, the same decision might well be made at a city meeting. However, the city officials who decided that issue would not be voting at the county meeting. Unconscionable or insensitive predetermined action could still occur, but only through the bad faith actions of separate individuals.

---

[16]Gunderson: "You would agree, would you not, that arguably, this places the commissioners of the City of Las Vegas—the City-County Commissioners of Las Vegas—in a position of tremendous advantage. Arguably, it does, doesn't it?"

Daykin: "There are circumstances under which it might."

Gunderson: "You would agree, would you not, that if the City-County seats for the City of Las Vegas were occupied by men who wanted to take an unconscionable advantage over their fellow County Commissioners, that they would be in a position to do so, would they not?"

Daykin: "I think that is true."

While local government may need many innovations to meet changing urban conditions and there is nothing to prevent experimentation to achieve the best result, still, the equality of the voting rights cannot be debased or diluted. Hadley v. Junior College District, cited above. Under the scheme set forth in Chapter 648, the voting strength of persons outside Las Vegas is diluted and the political machinery is structured so that the Las Vegas county-city commissioners may readily take unconscionable advantage of the other commissioners and their constituents. Indeed, not only is Chapter 648 structured so that the county-city commissioners can routinely decide issues without concern for the lesser "county commissioners," but they would be paid extra while doing so. See Sec. 13(5). Accordingly, we believe that there exists "a built-in bias tending to favor particular political interests."

In our view, in the instant case it is no answer to say that unfairness might also occur in a system where "built-in bias" was absent. Certainly the manifest unfairness of a poll-tax could not be justified by comparable means—i.e., by noting that, even absent the poll-tax, those unfairly advantaged might successfully utilize other means to keep constitutionally-intended "Blessings of Liberty" from all.

The foregoing brings into focus related principles, concerning the propriety of having city commissioners also serve on the county board, as here structured. Public policy demands that an office holder discharge his duties with undivided loyalty. Kaufman v. Pannuccio, 295 A.2d 639 (N.J.App. 1972). By permitting city commissioners to sit on the county board, the electors of both the city and county are deprived of undivided allegiance to their interests. See People v. Bagshaw, 130 P.2d 243 (Cal.App. 1942). As noted in McDonough v. Roach, 171 A.2d 307 (N.J. 1961) at 309 and 310: "[T]he county board is bound to consider the interests of all of its citizens while the local governing body has a like obligation to the citizenry of the municipality alone. No man, much less a public fiduciary, can sit on both sides of a bargaining table. He cannot in one capacity pass with undivided loyalty upon proposals he advances in his other role. * *, * 'It is no answer to say that the conflict in duties . . . may never in fact arise. It is enough that it may in the regular operation of the statutory plan.' "

## V

### *Conclusion*

In summary, then, we hold that commendable as governmental economy undoubtedly is as a goal, and desirable as consolidation of governmental services in the City of Las Vegas and conjacent areas may indeed therefore be, nonetheless Chapter 648 of the 1975 Statutes of Nevada, as adopted, violates fundamental provisions and precepts of our state and federal constitutions. Moreover, consistently with established law and legal principles, we deem it neither proper nor possible to sever the constitutionally objectionable portions of Chapter 648, and thereafter to sanction and participate in belated local efforts to restructure and implement the defective legislative scheme. Instead, we feel compelled to affirm the district court, which held Chapter 648 void in its entirety. Thus, we trust, if "consolidation" ultimately comes in Clark County, it will be benefited rather than burdened by well intentioned efforts of the past.

In this opinion, we have addressed only the most obvious and egregious constitutional defects in the statutory scheme now under consideration. By refraining to discuss other contentions, we do not, however, necessarily indicate belief that the same lack merit.

BATJER, MOWBRAY, THOMPSON, and ZENOFF, JJ., concur.