BREWERY ARTS CENTER; CARSON CITY CHILDREN'S MUSEUM; STEWART INDIAN MUSEUM ASSSOCIATION, INC.; CARSON VALLEY HISTORICAL SOCIETY; WESTERN FOLKLIFE CENTER; CITY OF WINNEMUCCA; CITY OF CALIENTE; LINCOLN COUNTY; YERINGTON GRAMMAR SCHOOL NO. 9 RESTORATION GROUP INC.; STOREY COUNTY FOURTH WARD SCHOOL BOARD OF TRUSTEES; WHITE PINE HISTORICAL FOUNDATION, INC.; WHITE PINE PUBLIC MUSEUM; AND THE LEGISLATIVE COMMISSION, PETITIONERS, *v.* THE STATE BOARD OF EXAMINERS, RESPONDENT.

No. 23321

December 11, 1992 843 P.2d 369

*Lorne Malkiewich,* Legislative Counsel, and *Brenda Erdoes,* Chief Deputy Legislative Counsel, Carson City, for Petitioners.

*Frankie Sue Del Papa,* Attorney General, *Brooke A. Nielsen,* Assistant Attorney General, and *Jonathan L. Andrews,* Chief Deputy Attorney General, Carson City, for Respondent.

## OPINION

*Per Curiam:*

The 1991 Nevada Legislature created the Commission for Cultural Affairs (the Commission) and required it, within one year of its formation, to establish a ten-year plan to preserve and promote Nevada's cultural resources and to develop a network of cultural centers and activities. The Legislature directed the respondent, the State Board of Examiners (the Board), to issue general obligation bonds to fund the projects identified in the ten-year plan. Pursuant to the provisions of Assembly Bill No. 590 (A.B. 590),[1] for the first year of the ten-year plan, the Commis-

---

[1]A.B. 590, § 5 provides:

 1. The state board of examiners shall issue general obligation bonds of the State of Nevada, in a face amount of not more than $20,000,000, to provide the money necessary to carry out the provisions of sections 1 to 4, inclusive, of this act.

 2. The money raised by the issuance of the bonds authorized by this

sion awarded $2,000,000 in grants to fifteen local governments and non-profit organizations. The purpose of the grants was to renovate and restore historical sites in Nevada.[2]

On May 14, 1992, bond counsel for the State declined to render an unqualified approving opinion on the issuance of these bonds. Bond counsel withheld approval because of the language of A.B. 590 § 5(5), which stated that the bonds are exempt from the constitutional debt limit because the bonds are "necessary for the protection and preservation of the *cultural resources* of this state and for the purpose of obtaining the benefits thereof." (Emphasis added.) The second paragraph of Article 9, § 3 in the Nevada Constitution[3] does not expressly exempt "cultural

---

section must be deposited with the state treasurer and credited to the fund for the preservation and promotion of cultural resources.

 3. The bonds may be issued at one time or from time to time.

 4. The provisions of the State Securities Law, contained in chapter 349 of NRS, apply to the issuance of bonds pursuant to this section.

 5. The legislature finds and declares that the issuance of bonds pursuant to this section is necessary for the protection and preservation of the *cultural resources* of this state and for the purpose of obtaining the benefits thereof, and constitutes an exercise of the authority conferred by the second paragraph of section 3 of article 9 of the constitution of the State of Nevada.

1991 Nev. Stat. Ch. 455 at 1347-48 (1991) (emphasis added). *See* NRS 233C.230 (reviser's note).

[2]Letters to the various recipients of the grants contained the following qualifications:

This letter does not represent a formal commitment on the part of the state, nor does it give you authority to initiate your project. The State cannot provide you with a funding agreement until the Bonds have been sold and the Commission can be assured that it is appropriate to initiate a formal commitment.

[3]Article 9, § 3 of the Nevada Constitution provides in part:

The state may contract public debts; but such debts shall never, in the aggregate, exclusive of interest, exceed the sum of two per cent of the assessed valuation of the state, as shown by the reports of the county assessors to the state controller, except for the purpose of defraying extraordinary expenses, as hereinafter mentioned. . . .

The state, notwithstanding the foregoing limitations, may, pursuant to authority of the legislature, make and enter into any and all contracts necessary, expedient or advisable for the protection and preservation of any of *its property or natural resources,* or for the purposes of obtaining the benefits thereof, however arising and whether arising by or through any undertaking or project of the United States or by or through any treaty or compact between the states, or otherwise. The legislature may from time to time make such appropriations as may be necessary to carry out the obligations of the state under such contracts, and shall levy such tax as may be necessary to pay the same or carry them into effect.

(Emphasis added.)

resources" from the debt limitation. Bonds that are not exempt from the State's debt limit are counted against the debt limit and negatively impact the ability of the State to borrow money for other projects. The unqualified approving opinion of bond counsel is necessary before the bonds are issued, for without such an opinion, the bonds are not marketable. Bond counsel recommended either obtaining a judicial decision that severed subsection 5 from A.B. 590 § 5, or having the 1993 Legislature amend the bill.

On June 18, 1992, the Board voted unanimously to accept the recommendation of Judy Matteucci (Matteucci), the State of Nevada Budget Director and the Clerk of the Board, to defer the issuance of the bonds until this court interprets, or the Legislature clarifies, the language of subsection 5 concerning the exemption of the bonds from the constitutional debt limitation. Matteucci's recommendation was based on the "questionable constitutionality" of A.B. 590 and on the need to review all of the remaining bond authorizations.

Petitioners argue that the Board has a non-discretionary legal duty to issue the general obligation bonds to fund the grants. Also, petitioners argue that they have no plain, speedy, and adequate remedy at law, and they request that this court issue a peremptory writ of mandamus commanding the Board to issue the bonds. In the alternative, petitioners request that this court issue a peremptory writ of mandamus compelling the Board to issue general obligation bonds, "either exempt or nonexempt from the constitutional debt limitation," for $2,000,000. Petitioners argue that, if action is not taken soon, some of the historic sites that A.B. 590 is intended to preserve may be lost.

A writ of mandamus is available to compel the performance of an act which the law requires as a duty resulting from an office, trust, or station, or to control an arbitrary or capricious exercise of discretion. *See* NRS 34.160; Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 637 P.2d 534 (1981). Mandamus is not available where the petitioner has a plain, speedy, and adequate remedy in the ordinary course of the law. NRS 34.170; NRS 34.330. Mandamus is an extraordinary remedy, and the decision as to whether a petition will be entertained lies within the sound discretion of this court. *See* Poulos v. District Court, 98 Nev. 453, 455, 652 P.2d 1177, 1178 (1982).

However, a writ of mandamus will not be "granted in anticipation of a supposed omission of duty, however strong the presumption may be that the persons whom it is sought to coerce by the

writ will refuse to perform their duty when the proper time arrives." State v. Public Service Com., 44 Nev. 102, 112, 190 P. 284, 286-87 (1920). "It is incumbent on the relator to show, not only that the respondent has failed to perform the required duty, but that the performance thereof is actually due from him at the time of the application." State of Nevada v. Gracey, 11 Nev. 223, 233 (1876).

The petition for the writ of mandamus alleges that the Board voted "to defer the issuance of the bonds required by A.B. 590." However, the Board has not failed or refused to act, and it has only voted to delay the issuance of the bonds. Because the Legislature did not designate a precise time in A.B. 590 for the issuance of the bonds, we infer that "reasonable time" and "reasonable diligence" were intended. Fuller v. Knight, 2 So.2d 605, 609 (Ala. 1941); Bremerton Municipal League v. City of Bremerton, 124 P.2d 798, 800 (Wash. 1942). "No rule can be laid down as to within what time bonds must be issued after they have been voted for or their issuance directed . . . ." Fuller, 2 So.2d at 610. See Chickaming v. Carpenter, 106 U.S. 663 (1882) (even where statute provides that bonds shall be issued within certain number of days after election authorizing the issuance, valid bonds may be issued after time specified). Courts have found it is not unreasonable to have delays of five and nine years following the authorization to issue bonds. Perl-Mack Civil Ass'n v. Board of Directors, Etc., 344 P.2d 685 (Colo. 1959) (en banc) (five years); Missouri Electric Power Co. v. Smith, 155 S.W.2d 113 (Mo. 1941) (nine years). In Petition of City of St. Louis, 363 S.W.2d 612 (Mo. 1963) (en banc), the court held that a delay of eighteen years did not bar issuance of previously unissued bonds. Based on these cases, we conclude the Board's delay, which has been less than two years, is within a reasonable time.

NRS 349.071(1) provides in part: "The state board of examiners may issue and redeem securities on behalf of the state, when such issue is authorized by law." (Emphasis added.) In S.N.E.A. v. Daines, 108 Nev. 15, 824 P.2d 276 (1992), this court stated: "[I]n statutes, 'may' is permissive and 'shall' is mandatory unless the statute demands a different construction to carry out the clear intent of the legislature." Id. at 19, 824 P.2d at 278. Mandamus may not be used to compel a discretionary act. Building & Constr. Trades v. Public Works, 108 Nev. 605, 609, 836 P.2d 633, 636 (1992); Young v. Board of County Comm'rs, 91 Nev. 52, 530 P.2d 1203 (1975). Therefore, because the Board has not failed to issue the bonds within a reasonable time and its

decision was discretionary, we conclude the Board's vote was an appropriate exercise of discretion which does not warrant the issuance of a writ of mandamus.

Petitioners next argue that the bonds are exempt from the constitutional debt limitation because they concern a natural resource of Nevada. This court will not decide a constitutional issue unless necessary to the determination of a case. Williams v. State, 97 Nev. 1, 5 n.4, 620 P.2d 1263, 1266 n.4 (1981). Because the Board's exercise of discretion depended in part on our interpretation of A.B. 590 § 5(5) under the Nevada Constitution, we address this issue.

In Marlette Lake Co. v. Sawyer, 79 Nev. 334, 383 P.2d 369 (1963), this court held that the Nevada Constitution permitted the Legislature to authorize the State to exceed the debt limitation by purchasing private water rights and a distribution system. Relying on *Marlette,* petitioners contend that the Legislature has the power to decide what State actions protect and preserve its property and natural resources. However, in *Marlette,* the State itself was purchasing the water system from a private company. The issue was whether the fact that the system was still privately owned prevented a "natural resources" exemption under Article 9, § 3 of the Nevada Constitution. *Id.* at 338, 383 P.2d at 370-71. Unlike *Marlette,* in the instant case, the State does not own, or propose to own, any of the property which will benefit from the bonds. Furthermore, NRS 233C.220(3)[4] specifies the criteria that the Commission should use in awarding grants, and these same criteria are listed in the Commission's ten-year plan. However, only one of the seven funding criteria specifically addresses the preservation of property. Much of the criteria involves the programming element of cultural resources, and programming is not exempt from Nevada's debt limit. In sum, the property in ques-

---

[4]NRS 233C.220(3) provides that the Commission may:

Specify the criteria by which proposed projects will be judged. The criteria must include, but not be limited to, a consideration of the degree to which a proposed project:

(a) May become a recurring event without the necessity of future state financial support;

(b) Will be accessible to the community;

(c) Will promote tourism in the state;

(d) Will promote or preserve some historic or prehistoric feature of Nevada;

(e) Will have multiple uses for many types of cultural organizations;

(f) Will supplement training in the classroom in the arts and the humanities; and

(g) Incorporates the various disciplines directly associated with cultural resources.

tion is not State-owned and it does not constitute "natural resources," nor are some of the bond funds designated for the preservation of property. Therefore, we conclude that the "cultural resources" in A.B. 590 § 5(5) are not exempt from the constitutional debt limitation under Article 9, § 3 of the Nevada Constitution, and therefore, the bonds in question are also not exempt from the constitutional debt limitation.

Alternatively, petitioners argue that this court should sever subsection 5 from § 5 of A.B. 590. Subsection 5 states that the issuance of the bonds shall be pursuant to the exemption from the constitutional debt limitation. Petitioners contend that: (1) this court has the power and the duty to sever subsection 5 because the remaining provisions of the bill are complete with the subsection excised, and (2) the 1991 Nevada Legislature intended that the cultural resource bonds be issued regardless of the constitutional debt limitation. *See* County of Clark v. City of Las Vegas, 92 Nev. 323, 335-40, 550 P.2d 779, 787-91 (1976).

This court cannot sever a provision from a bill unless the remaining provisions, standing alone, meet a two-pronged test under which: (1) the provisions have legal effect, and (2) it appears the Legislature intended the provisions to stand alone even if another section in the same act is held invalid. *Id.* at 336, 550 P.2d at 788. In the instant case, the first prong of the test is satisfied because, without A.B. 590 § 5(5), the remaining sections of A.B. 590 nevertheless have legal effect. However, unlike the statute in *County of Clark,* A.B. 590 has no severability clause. Therefore, because it does not appear the Legislature intended A.B. 590 to stand alone without subsection 5 of section 5, we decline to sever it.

In conclusion, the Board's decision to defer issuing the bonds was an appropriate exercise of discretion, and the bonds are not exempt from the constitutional debt limitation. The subject cultural resources may never become state property. We decline to set a precedent which would furnish a basis for writing the debt limit out of the constitution, particularly when the taxpayers have no assurance that the bond funds will not inure to the benefit of private parties rather than to the state. Moreover, mandamus is an extraordinary remedy. Houston Gen. Ins. Co. v. District Court, 94 Nev. 247, 578 P.2d 750 (1978). Petitioners have other adequate legal remedies available to them, including legislative clarification from the 1993 Nevada Legislature. Accordingly, we deny the petition for a writ of mandamus.

Rose, J., dissenting:

Respectfully, I dissent.

The Legislature's clear intent was to appropriate the funds to renovate and preserve historic and cultural treasures and to exempt the funds from the State's constitutional debt limit. The fact that the Legislature did not designate some of the funds for the programming element of cultural resources is not problematic. The State's desire to preserve the properties and benefit from them requires some expenditures to cover the costs of furnishings, operations, and programming. Display cases necessitate windows, tourists require places to sit, and staff members need salaries for their services. These are reasonable expenditures within the broad purpose of restoring the structures to benefit the State.

In Marlette Lake Co. v. Sawyer, 79 Nev. 334, 383 P.2d 369 (1963), this court stated:

> [T]he second paragraph of Nev. Const. art. 9, § 3, enables the legislature (without regard to the debt ceiling established by the first paragraph thereof) to enter into any contract (with the United States, another state, or with anyone having the capacity to contract) which the legislature deems necessary, expedient or advisable for the purpose of securing the benefits of or protecting and preserving property or natural resources located within the geographical limits of Nevada.

*Id.* at 338, 383 P.2d at 371 (footnote omitted). Thus, when Article 9, § 3 of the Nevada Constitution refers to "its property or natural resources," the term "its" has a geographical rather than a proprietary connotation. As long as property is within the geographical limits of the State of Nevada, the Legislature may exempt it from the debt ceiling. In the instant case, the Legislature has plainly deemed it advisable to preserve the property. Because the structures designated for protection and preservation are within the geographical limits of the State of Nevada, I would hold that the bonds are exempt from the constitutional debt limitation.

The Legislature knew that specific structures were the subject of the bill, and all of the structures are of significant historical value. *See* A.B. 590 § 2(2)(c). Almost one and one-half years have elapsed since A.B. 590 was passed. I doubt the Legislature envisioned a delay of eighteen years, or even five years, before the State would issue the bonds to finance the preservation and restoration of the structures. The length of the delay thus far sufficiently warrants the extraordinary remedy of mandamus directed toward issuing the bonds to preserve the structures. Each

additional day of postponement allows the natural elements, vandalism, and accidents to contribute to the deterioration of these irreplaceable properties. In fact, in A.B. 590 § 2(2)(c)(2), the Legislature designated some of these funds to restore and improve the Nixon Opera House in Winnemucca so that it would meet the requirements of the fire code, and that structure has unfortunately burned to the ground since the Legislature passed A.B. 590. If the Legislature did not intend to appropriate the funds at once and exempt them from the debt limit, the Legislature may clarify that in the 1993 session. In the meantime, I would grant the writ so that the work of restoration may begin forthwith.